**In re WHEELING–PITTSBURGH STEEL CORPORATION, Debtor-in-Possession.**

**Civ. A. No. 85–1660.**

United States District Court, W.D. Pennsylvania.

Aug. 28, 1985.

---

998

John McLean, M. Bruce McCullough, Buchanan, Ingersoll, Rodewald, Kyle & Buerger, Pittsburgh, Pa., for Wheeling-Pittsburgh.

Roger J. Lerner, Washington, D.C., for Pension Ben. Guar. Corp.

George Raynovich, Jr., Pittsburgh, Pa., for Wheeling-Pittsburgh.

Robert G. Sable, Pittsburgh, Pa., and Barbara Kaplan, New York City, for Official Committee of Unsecured Creditors.

Michael J. Yurcheshen, Pittsburgh, Pa., and Harvey R. Miller, New York City, for Prudential Life Ins. Co., et al.

Joel M. Walker, Pittsburgh, Pa., and Warren R. Stern, New York City, for principal banks.

Paul Whitehead, Carl Frankel, Garry Sasso, Michael H. Gottesman, Robert M. Weinberg, Gary L. Sasso, Bredhoff & Kaiser, Washington, D.C., and Claude Montgomery, Booth Marcus & Pierce, New York City, for UWSA.

## OPINION

MENCER, District Judge.

In 1960, Justice Douglas wrote:

A collective bargaining agreement is an effort to erect a system of industrial self-government. When most parties enter into contractual relationship, they do so voluntarily, in the sense that there is no real compulsion to deal with one another, as opposed to dealing with other parties. This is not true of the labor agreement. The choice is generally not between entering or refusing to enter into a relationship, for that in all probability preexists the negotiations. Rather, it is between having the relationship governed by an agreed-upon rule of law or leaving each and every matter subject to a temporary resolution dependent solely upon the strength, at any given moment, of the contending forces.

*United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 580, 80 S.Ct. 1347, 1351, 4 L.Ed.2d 1409 (1960).

In 1984, the Supreme Court in *NLRB v. Bildisco and Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), held that collective bargaining agreements may be rejected under the provisions of the then-existing bankruptcy laws if a Chapter 11 debtor can establish that the agreement is

burdensome to the estate and that the balance of the equities favors rejection.

Disappointment was the understandable reaction of organized labor to the *Bildisco* decision. Congress responded by adding Section 1113 to the Bankruptcy Code by P.L. 98–353 for cases commenced on and after July 10, 1984.

Section 1113 provides in relevant part:

(a) The debtor in possession, or the trustees if one has been appointed under the provisions of this chapter, other than a trustee in a case covered by subchapter IV of this chapter and by title I of the Railway Labor Act, may assume or reject a collective bargaining agreement only in accordance with the provisions of this section.

(b)(1) Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section 'trustee' shall include a debtor in possession), shall—

(A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and

(B) provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.

(2) During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.

(c) The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that—

(1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);

(2) the authorized representative of the employees has refused to accept such proposal without good cause; and

(3) the balance of the equities clearly favors rejection of such agreement.

On May 31, 1985, Wheeling-Pittsburgh Steel Corporation (hereinafter "Wheeling-Pittsburgh"), the debtor-in-possession in this case, sought authorization in the bankruptcy court of this district to reject its collective bargaining agreements with the United Steelworkers of America, AFL–CIO–CLC (hereinafter "USWA"), agreements entered into by Wheeling-Pittsburgh and USWA in January 1983 and scheduled by their terms to expire on July 31, 1986.

The bankruptcy court held that Wheeling-Pittsburgh had established its entitlement under Section 1113 to reject the agreement, and entered an order on July 17, 1985 authorizing Wheeling-Pittsburgh to do so. USWA filed an appeal to this Court from that order. After denying a Motion to Stay filed by USWA, we established an expedited briefing schedule relative to its appeal.

The proper standard of this Court's review is Bankruptcy Rule 8013 which provides:

On an appeal the district court … may affirm, modify, or reverse a bankruptcy court's judgment, order or decree, or remand with instructions for further proceedings. Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

■ Therefore, the standard of review of facts required by the bankruptcy rules is the clear erroneous test and the Court of Appeals for the Third Circuit has so de-

clared in the case of *In Re Morrissey*, 717 F.2d 100 (3d Cir.1983).

In the instant case, Bankruptcy Judge Bentz made his analysis of the nine requirements necessary for rejection of a collective bargaining agreement as imposed by § 1113 of the Code.

1. The debtor in possession must make a proposal to the Union to modify the collective bargaining agreement.

2. The proposal must be based on the most complete and reliable information available at the time of the proposal.

3. The proposed modifications must be necessary to permit the reorganization of the debtor.

4. The proposed modifications must assure that all creditors, the debtor and all of the affected parties are treated fairly and equitably.

5. The debtor must provide to the Union such relevant information as is necessary to evaluate the proposal.

6. Between the time of the making of the proposal and the time of the hearing on approval of the rejection of the existing collective bargaining agreement, the debtor must meet at reasonable times with the Union.

7. At the meetings the debtor must confer in good faith in attempting to reach mutually satisfactory modifications of the collective bargaining agreement.

8. The Union must have refused to accept the proposal without good cause.

9. The balance of the equities must clearly favor rejection of the collective bargaining agreement.

Judge Bentz concluded that the burden of persuasion is on the debtor as to all nine requirements. He then applied these requirements to the facts that he found to exist in the instant case and concluded that the debtor in possession had met its burden here and that the application for rejection of the collective bargaining agreement should be approved.

Wheeling-Pittsburgh is willing to adopt the opinion of Bankruptcy Judge Bentz without supplementation and not surprisingly contend that he reached "a correct conclusion." USWA advances a plethora of reasons why the Bankruptcy Court misunderstood and misapplied the applicable legal standards and misconceived the nature and quality of the proof necessary to meet them.

Contractual obligations should be deemed binding and not subject to unilateral termination or capable of being set aside on slight pretense of financial inability. However, in a Chapter 11 setting successful rehabilitation of debtors may require a rejection of agreements entered into by employer-employee parties. The eye of the beholder must focus in on the fundamental fact of economic life—the purpose of reorganization for a debtor in bankruptcy is to prevent that debtor from going into liquidation with an attendant loss of jobs and possible misuse of economic resources. Surely, the intent of Congress when it enacted into law Section 1113 of the Bankruptcy Code was not of a contrary nature.

On April 16, 1985, Wheeling-Pittsburgh filed its Chapter 11 petition. On May 9, 1985, the company made a new proposal to the Union seeking further and deeper labor concessions, the main items being a reduction in overall wage costs to $15.20 per hour, as compared to $21.40 per hour at the end of 1984, and a five-year contract term. On May 31, 1985, Wheeling-Pittsburgh filed a motion to reject the collective bargaining agreements with USWA and a hearing lasting four days was held during mid-June.

USWA in this appeal mounts a very serious challenge to the Bankruptcy Court's holding that the modifications to the collective bargaining agreements proposed by Wheeling-Pittsburgh were "necessary to permit the reorganization of the debtor." The Company put into evidence its new contract proposal, together with the Company's financial projections on which it was based and assertions, conclusory in nature, from three key officials and a financial expert that the labor concessions were necessary for the Company to reorganize.

The Union responded by evidence that it was not necessary to modify the collective bargaining agreement at all in order to permit the reorganization of Wheeling-Pittsburgh, since the agreement would expire in approximately one year on July 31, 1986. In addition, the Union asserts that if some modification is necessary to permit reorganization, the modifications sought here are unduly drastic and unsupportable.

A central feature of § 1113 is that the debtor must prove that the proposed alterations of the collective bargaining agreement "are necessary to permit the reorganization of the debtor." Here, the Wheeling-Pittsburgh officials testified relative to the depressed condition of the steel industry which impacts on its capability to operate profitably and causes its severe financial difficulties. The officials also proffered the projected $15.20 labor rate as being necessary in order to successfully reorganize. Likewise, it was urged that labor stability was necessary during the reorganization period.

Judge Bentz evaluated this evidence as follows:

Three of Wheeling-Pittsburgh's witnesses testified that the $15.20 labor cost and five year contract term both are necessary for the Company to reorganize: Chairman and CEO Carney, Senior Vice-President and Chief Financial Officer Rose, and Senior Vice-President for Industrial Relations Scalise. In addition, Nicholas John Sakellariadis, First Vice-President in the Corporate Finance Department of E.F. Hutton Company, who assisted Wheeling-Pittsburgh in the preparation of the May 9 proposal, also testified that both the $15.20 labor rate and five year contract term were necessary to the Company's reorganization. In response, the Union offered the testimony of its experts to show that (1) no modifications of the existing collective bargaining agreement are necessary; and (2) in any event, the particular modifications that the Company proposes are not necessary for reorganization.

In support if its position that no modifications of the existing contract are necessary, the Union first posits that honoring the existing contract could threaten reorganization only if paying the contractual labor costs (through the end of the contract period) would deny Wheeling-Pittsburgh the cash required to meet the Company's operational needs. The Union then adduced evidence to show that Wheeling-Pittsburgh would have sufficient cash balances *throughout the contract term* to meet current operational needs if the Company continued to pay the contractual labor rate. From this the Union concludes that the current contract rate does not threaten reorganization, and therefore no proposed modification of the contractual labor rate is necessary.

It must be observed that the only reason the Company is in business today is that its cash has been protected and regenerated by the protections against creditors afforded by the bankruptcy laws. The cash availability is created by freezing the status of creditors who ought to be paid in the ordinary course of business. This factor, and the plight of creditors so held at bay, cannot be overlooked in determining what is necessary to achieve a reorganization.

Assuming *arguendo* that the Company could continue to pay the contract rate and still have enough cash on hand at the expiration of the collecive bargaining agreement to meet its current operational needs, those facts do not resolve the relevant issue. The Union concedes as much when it emphasizes that:

The initial question posed by § 1113 is not whether the existing collective agreement (sic) needs to be modified but whether the contract modifications *proposed* by the debtor are 'necessary to permit reorganization' (emphasis in original). *The statutory focus is thus on the terms of the debtor's proposal not on the terms of the existing agreement* (emphasis supplied).

Accordingly, the question is *not* simply whether Wheeling-Pittsburgh can continue to pay the $21.40 rate required by the current *collective bargaining agreement* and still emerge with enough cash in hand

at the contract term to meet current operational expenses. The relevant question is whether it is necessary for Wheeling-Pittsburgh to pay the $15.20 rate found in its *proposal* in order to successfully reorganize. The questions are not the same. At the expiration of the collective bargaining agreement, Wheeling-Pittsburgh may emerge with enough cash on hand to meet its current operating expenses; but if a successful reorganization necessitates more cash than that, and if the proposed $15.20 modification is necessary to help generate the additional cash requirements, then the proposed modification is necessary for reorganization. Therefore, the first problem with the Union's characterization of the issue is that it overlooks the fact that in order for the debtor to successfully reorganize, it will be necessary to do more than just emerge from the current labor contract with enough cash on hand to meet current operating expenses.

A related problem with the Union's characterization of the issue is that it focuses on what the debtor does *not* need to do in order to 'ride out' the period of the collective bargaining agreement rather than focus on what the debtor *needs* to do in the long run to reach the broader goal of reorganization. The paramount goal in a Chapter 11 is reorganization of the Company, not preservation of the collective bargaining agreement. Understandably, the Union desires to emerge from this proceeding having preserved the terms and conditions of its collective bargaining agreement. However, if by doing so, the Company is pushed into liquidation, the Union's victory will have been a Pyrrhic one. " '[C]ontracts with a liquidated company offer hollow promises.' " In any event, the proper issue to consider is whether the proposed $15.20 rate is necessary to permit Wheeling-Pittsburgh's reorganization.

The evidence and testimony support the Company's argument that the $15.20 labor rate is necessary for the Company's reorganization. This $15.20 figure was the product of a calculation predicated on various assumptions relating to Wheeling-Pittsburgh's costs, production volume, price, market share, and capital expenditures over the next five years. The Union contends, however, that the Company's assumptions were unreasonably pessimistic and that the Company will be in a better financial position in five years than it predicts, thereby enabling it to afford a wage rate higher than $15.20. The court does not find credible the Union experts' optimism regarding the steel industry and Wheeling-Pittsburgh's future participation therein. The United States steel industry today is in very critical shape; the price of steel over the last three to five years, adjusted for inflation, has declined; rising steel imports have cut into the domestic steel market despite federal · "dumping" laws; steel plant shutdowns are growing more numerous as are steelworker layoffs; and the most optimistic forecasts predict only relatively small market improvements which are not significant when measured against the industry overcapacity.

The foregoing factors help explain this debtor's current plight. Wheeling-Pittsburgh has sustained significant losses over the last three years; the Company is producing steel at only 50%–60% of capacity; the bulk of the Company's cash goes to paying utilities and labor costs (labor costs comprise 35–40% of the Company's total costs); the Company owes $50–$65 million this year for last year's pension fund liabilities; the Company owes approximately $125 million to unsecured creditors, $547 million to secured creditors (the collateral for which may be worth less than $100 million); and a total of $121 to $363 million to pension benefit plans. In view of the foregoing, it cannot be said that the Company's projections were unecessarily (sic) pessimistic. Even if Wheeling-Pittsburgh could significantly reduce its utility and other non-labor costs, (which is doubtful) it is clear that a reduction in labor costs is also necessary if the Company is to have any hope of reorganizing. This Company is in deep financial difficulty; its continued existence is in question; and the $15.20 labor rate, along with other concessions by all parties in interest, is necessary if a

reorganization is to be achieved and a liquidation avoided.

Turning to the proposed five year collective bargaining term, the Union concedes that the Company should have a stable labor arrangement at the time it emerges from reorganization. However, the Union argues that a five year agreement is not necessary to achieve this goal since stability can be achieved through a contract of shorter duration. The Union further argues that in any event, it is unnecessary to commence any agreement at the present time to achieve a stable labor cost during reorganization since there will be time enough at the expiration of the current agreement (in 13 months) to negotiate that figure.

Wheeling-Pittsburgh's period of reorganization likely will last *at least* five years. The Company proposal contemplates a 10 year payout of a 50% dividend to over $500 million of general unsecured claims. The court accepts as credible the testimony that with the $15.20 labor rate, the Company would get to a point 5 years out where it is at almost a dead break even. This will hopefully allow, but not guarantee, payment on dividends to general creditors. Conceding, as the Union does, that labor stability is necessary during the reorganization period, there is no evidence as to how labor stability can be achieved with a contract of less than five years' duration. Therefore, the court finds that the five year term is necessary for the debtor's reorganization.

The Union next argues that, in any event, it is not necessary to commence any agreement at the present time to achieve a stable labor cost during reorganization since there will be time enough at the expiration of the

current agreement (in 13 months) to negotiate a new labor rate. The court has already found that $15.20 is the labor rate necessary for the Company's reorganization. Therefore, there is no need, reason or justification for waiting 13 months for relief from a losing situation, and there are good reasons for commencing relief now. Labor instability threatens the Company's sales volume and customer base. If, as both parties agree, labor stability is necessary to protect sales and customer relations in this reorganization process, then it should be achieved now and not 13 months in the future. (Emphasis in original.) (Footnote omitted.)

■ Although this Court might not have made the same findings of fact, we agree with Judge Bentz's conclusion that the "necessary" standard of § 1113 does not mean "absolutely essential" as the USWA contend here. A more practical long range test of a less stringent nature is more compatible with congressional intent where the emphasis in § 1113(b)(1)(A) is upon the reorganization of the debtor and the fair and equitable treatment of all creditors, the debtor and all affected parties. The prevention of the debtor going into liquidation, ensuring the loss of jobs, is a goal and policy decision of the Bankruptcy Code which indicates an intent of Congress to impose a "necessary" standard to be satisfied by considerations of feasibility for reorganization.

The Bankruptcy Judge is entrusted with making the determination as to whether the debtor has met its burden of showing that the modifications proposed are necessary to permit the reorganization of the debtor.[1] The District Court on appeal may

---

1. Admittedly, the debtor in possession can place unrealistic and unfair evaluations and projections on the formula factors of volume, future price, overhead, including settlement with creditors, when estimating affordable labor costs. As the Chairman and Chief Executive Officer of Wheeling-Pittsburgh, Dennis J. Carney, testified on cross-examination: "Any one of those three [price, volume and settlement with creditors] and you can get [by changing assumptions] any number you want. You can get $28 an hour. If

you want to assume nice price and volume. And you can get $15 an hour. And you can get $15 an hour, if you look at where we are today, losing our shirts."
This record may arguably approach such an unrealistic projection because of the assumptions made in arriving at the proposed $15.20 per hour labor cost. However it is the Bankruptcy Court in the first instance who having heard the witnesses and reflected upon the evidence that is the safety valve which prevents the

only reverse that determination where the Bankruptcy Judge is clearly erroneous and this Court's review of the entire record does not leave us with the definite and firm conviction that a mistake has been committed by Judge Bentz.

The USWA argue that a "necessary" standard that is satisfied by considerations of feasibility for reorganization is a return to the holding of the *Bildisco* decision and ignores the response of Congress to that decision. Not so, since *Bildisco* permitted a unilateral termination of a collective bargaining agreement *before* formal rejection by the Bankruptcy Court. Congress in turn passed P.L. 98–353 which prevents such unilateral termination by the debtor and sets forth the nine procedural and substantive requirements that must be met prior to rejection approval by the Bankruptcy Court. However, we cannot conclude that Congress intended to impede and prevent a plan of reorganization, which would avoid liquidation of the debtor and the termination of jobs, by enacting a standard for reorganization that postpones until the future the facing of economic reality.

In actuality, this is not a typical adversary proceeding but rather a tense and imperative struggle for the survival of a company and the preservation of jobs generated by that company's normal operations. The Company and Union are both in the same boat faced with a serious and common problem that may well sink all who are aboard, including the equity holders and lenders. The response to the problem cannot be unfairly shifted to one group while the others sit by with a nonchalant claim of a preferred interest. The response needed is for all to bail water, pull together, throw overboard that portion of the heavy cargo that can be sacrificed, head for safe ground and try to weather the storm with the hope that all will not be lost. This is really what is involved and

must be faced when a debtor in possession in Chapter 11 seeks to survive in the business world by a reorganization plan. Congress entrusted the supervision of the plan to the Bankruptcy Court and Congress cannot be charged with taking sides by setting standards which favor one of the boat's occupants over another.

USWA contends that even if the Company's May 9 proposal sought contract modifications "necessary" to permit reorganization, the proposal did not assure that all creditors, the debtor and all of the affected parties are treated fairly and equitably as required by § 1113(b)(1)(A).

Judge Bentz made the following analysis:

> The Union contends that the Company's proposal would impose a disproportionate share of the burden of reorganization on the backs of its employees. In particular, the Union argues that the proposal does not provide for any upward adjustment in the labor rate to ensure that the employees share in whatever benefits may eventuate should the Company do better financially than it has projected. Instead, the Union argues, the employees are relegated to a 'substandard' wage rate for five years.
>
> However, the Union produced no evidence to establish the level of a 'standard' wage rate, nor to prove that one rate or another is 'substandard.' It is obvious that $15.20 is far from $21.40 and even farther from $25.00. But the evidence before the court relates to costs necessary to achieve a reorganization, not to whether such costs are 'standard' or 'sub-standard' as measured against some other scale.
>
> It is relevant to note that the proposal also does *not* provide for any downward adjustment below the $15.20 in the event the Company continues to lose money. The steel industry and this Company are

Company from unfairly computing labor's wage rate to produce a plan of reorganization born of corporate greed and not stark fiscal reality. As the current strike proves, workers do not have to work for wages they deem unfair, but a

company cannot long continue to operate when costs exceed income and when such a company stops operating, workers have no choice relative to working on any terms, since there are no longer jobs to work.

in serious financial trouble. It might not be inequitable to ask hourly employees to share in future shortfalls, but that has not been done. In any event, the proposal provides cost stability for the Company, and also provides wage stability for Union workers.

Creditors, on the other hand, are to be subjected to a 50% loss amounting to losses of some $250 million, with the 50% balance payable over 10 years. This is a significant sacrifice by itself; and if the Company's profitability projections ultimately prove to have been too optimistic, there could be a default in payments to creditors resulting in further losses to them. Therefore, the creditors are sacrificing much for the reorganization of the Company.

The Union further argues that creditors may fare better than employees because creditors may get stock for their claims. But that will likely occur only if there is insufficient money to pay dividends on creditors' claims. If stock is issued as payment for claims, in whole or in part, such claimants will have become involuntary investors in stock of questionable value.

Finally, salaried employees have been without wage increases since about 1981, and took a 10% reduction in 1982, half of which was restored in 1984. The salaried wage structure is below that of the industry generally, and is such that salaried workers leave for better paying jobs elsewhere. The Company has difficulty finding qualified replacements. No further sacrifices in this sector are warranted.

Our review of the record does not produce a conviction that the proposed plan will place a burden upon the employees disproportionate from that burden on other affected parties or that Judge Bentz's conclusion "that under the proposal, the burdens of past losses and future recovery from an unfortunate present financial situation will be shared fairly and equitably among all the parties concerned" constitutes a mistake which requires correcting by this Court.

Next, we turn our attention to the Union's contention that the Bankruptcy Court erred in concluding that Wheeling-Pittsburgh had shown that it had bargained in good faith in attempting to reach mutually satisfactory modifications.

Section 1113(b)(2) reads:

During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.

If the debtor does not confer in good faith toward the end of reaching mutually satisfactory modifications of the agreement, the Union will have "good cause" to reject the debtor's proposal. To ensure a realistic prospect that the parties will reach mutually satisfactory modifications, the debtor must provide the representative of the employees with such relevant information as is necessary to evaluate the proposal.

USWA assert that Wheeling-Pittsburgh waited only 22 days after submitting the May 9 proposal to the Union before filing its application for rejection of the collective bargaining agreements and refused to cooperate with the Union's financial experts relative to providing necessary financial information to the Union. Accordingly, the Union claims a lack of good faith on the part of the Company.

We deem "good faith" as that term is used in § 1113(b)(2) to mean that the debtor in possession make reasonable efforts to negotiate a voluntary modification but a failure to achieve mutually satisfactory modifications indicates no more than the difficulty of the task.

In the instant case, Judge Bentz made a specific finding of fact that "Wheeling-Pittsburgh did provide the Union with the information necessary to evaluate the proposal, did provide this information in time

to conduct meaningful negotiations and did in fact make reasonable efforts to negotiate."

Although there is testimony of record that would refute these findings, we cannot state that this Court is left with a definite and firm conviction that the Bankruptcy Court's findings in this regard are mistaken and not supportable by substantial evidence of record.

■ The 22 day period utilized by the Company for this phase of the § 1113 procedure, although short, when measured against the complexity of the financial information that could be marshaled for or against the proposal, is not inherently unreasonable since § 1113 has no time restraint relative to when the debtor, following the submission of a proposal, may file its rejection application. Such a lack of a time restraint in § 1113 further supports Judge Bentz's determination that the three week negotiation period in and of itself did not evidence a lack of good faith on the part of the debtor.

The Court has carefully examined the balance of the requirements imposed by § 1113 of the Bankruptcy Code as necessary prerequisites for approval of a debtor application for rejection of a collective bargaining agreement and we are satisfied that here the debtor has met its burden of proof relative to these remaining requirements. USWA does not strongly challenge in this appeal our conclusion as to these requirements.

Little authority has been cited in this opinion since this seems to be a case of first impression following the enactment of § 1113 of the Bankruptcy Code, 11 U.S.C. § 1113. The cases that have dealt with this section have mainly considered interim changes as provided for by § 1113(e). *See In re Carey Transportation, Inc.*, 50 B.R. 203 (S.D.N.Y.1985); *In re Russell Transfer, Inc.*, 48 B.R. 241 (W.D.Va.1985); *In re Salt Creek Freightways, Inc.*, 47 B.R. 835 (D.Wyo.1985); *In re Salt Creek Freightways, Inc.*, 46 B.R. 347 (D.Wyo.1985); *In re American Provision Co.*, 44 B.R. 907 (D.Minn.1984), and *In re Wright Airlines Inc.*, 44 B.R. 744 (N.D.Ohio 1984).

Our search for congressional intent relative to § 1113 has been foundationed on a realization that the policy of Chapter 11 is to permit successful rehabilitation of debtors. Of course such rehabilitation must involve the balancing of the interests of the debtor, creditors and employees.

Justice Rehnquist wrote of this Chapter 11 policy consideration in *NLRB v. Bildisco & Bildisco, supra,* in these terms:

The Bankruptcy Court must consider the likelihood and consequences of liquidation for the debtor absent rejection, the reduced value of the creditors' claims that would follow from affirmance and the hardship that would impose on them, and the impact of rejection on the employees. In striking the balance, the Bankruptcy Court must consider not only the degree of hardship faced by each party, but also any qualitative differences between the types of hardship each may face.

The Bankruptcy Court is a court of equity, and in making this determination it is in a very real sense balancing the equities, as the Court of Appeals suggested. Nevertheless, the Bankruptcy Court must focus on the ultimate goal of Chapter 11 when considering these equities. The Bankruptcy Code does not authorize free-wheeling consideration of every conceivable equity, but rather only how the equities relate to the success of the reorganization. The Bankruptcy Court's inquiry is of necessity speculative and it must have great latitude to consider any type of evidence relevant to this issue.

Section 1113 was not enacted to change the policy of Chapter 11 but only to guarantee that full and careful consideration would precede any rejection, a rejection that would not be a unilateral one by the debtor but by a Bankruptcy Court functioning as a court of equity. The intent of Congress was to place the burden on the debtor to show to the Bankruptcy Court, charged with balancing the equities and the interests of the affected parties, the need

to reject the collective bargaining agreement in order to achieve a successful rehabilitation of the debtor to avoid the consequences of liquidation and the loss of jobs.

The legal representation provided to USWA relative to this appeal has been outstanding and this Court has pondered long as to the correctness of the legal concepts which they have espoused. However, we cannot accept interpretations of § 1113 which attribute to Congress an intent to temporarily shield employees from the consequence of the employer's financial plight with the attendant risk that such temporary protection will exasperate the crisis and fuel the possibility of total fiscal disaster which would jeopardize future job availability for those employees.

Finally, this entire matter is one about which men of good will can hold honest differences of opinion. This is not the problem. The task is finding a way that will be deemed fair to all parties to move forward together to cope with a most serious financial dilemma, the cause of which in part is no one's fault and in part supplies sufficient fault to be shared by all involved parties.

If a way out of this financial and legal mire, which has produced anger, distrust, accusations, finger pointing and a major labor strike, is to be found, it will have to be a joint effort based on cooperation by the parties and not judicial fiat. Judge Bentz counseled likewise when he concluded his opinion in this fashion:

> The parties recognize that this is a collective bargaining dispute and that this court, as a place for resolving a collective bargaining dispute, is not the proper forum. The real decisions must be made at the bargaining table. If Wheeling-Pittsburgh is to be saved and not liquidated, the Union and the Company (representing not only management and shareholders, but also bargaining on behalf of creditors—because the Company must later deal with creditors) must work out a solution at the bargaining table taking into consideration the hard realities that face them economically. This court can-

not compel, but it can and does encourage the parties to continue negotiations to reach a solution, without which the likelihood of liquidation is very real.

A word to the wise has not yet been sufficient and so it is hoped that its repetition here will prompt the parties to negotiate without ceasing until a fair accord is reached. The inability or unwillingness to do so will not produce a winner and a loser but the premature fall of proud warriors whose last struggle will be overshadowed by a failure to sense their need for each other.

An appropriate order will issue.

### ORDER

AND NOW, this 28th day of August, 1985, after the consideration of briefs, and for the reasons set forth in the Opinion filed with this Order,

IT IS ORDERED that the Order, dated July 17, 1985, of the Bankruptcy Court of the Western District of Pennsylvania which approved the rejection by the Wheeling-Pittsburgh Steel Corporation of the collective bargaining agreements, bargained to end on July 31, 1986, between Wheeling-Pittsburgh Steel Corporation and the United Steelworkers of America, AFL–CIO–CLC is AFFIRMED.