**WHEELING-PITTSBURGH STEEL CORPORATION,**
Debtor-in-Possession

v.

**UNITED STEELWORKERS OF AMERICA, AFL–CIO–CLC,**
Appellant.

No. 85–3489.

United States Court of Appeals, Third Circuit.

Argued Feb. 19, 1986.

Decided May 28, 1986.

Bernard Kleiman, Carl B. Frankel, Paul Whitehead, United Steelworkers of America, Pittsburgh, Pa., Michael H. Gottesman (argued), Robert M. Weinberg, Gary L. Sasso, Bredhoff & Kaiser, Washington, D.C., Claude Montgomery, Booth, Marcus & Pierce, New York City, for appellant, United Steelworkers of America, AFL–CIO–CLC.

John J. McLean, Jr. (argued), M. Bruce McCullough, Buchanan Ingersoll, P.C., Pittsburgh, Pa., Ronald Orr (argued), Gibson, Dunn & Crutcher, Los Angeles, Cal., for appellee, Wheeling-Pittsburgh Steel Corp.

Nathan B. Feinstein, Lawrence G. McMichael, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, Pa., Joel M. Walker, Pollard & Walker, Pittsburgh, Pa., Theodore Gewertz, Denis F. Cronin, Warren R. Stern (argued), Thomas Moers Mayer, Andrew C. Houston, Wachtell, Lipton, Rosen & Katz, New York City, for the Principal Bank Creditors.

James Katz, Robert F. O'Brien, of counsel, Tomar, Parks, Seliger, Simonoff & Adourian, Haddonfield, N.J., for amicus curiae, Glass, Pottery, Plastics & Allied Workers Intern. Union, AFL-CIO-CLC.

David M. Silberman, Laurence Gold, Washington, D.C., for amicus curiae, American Federation of Labor and Congress of Industrial Organizations, AFL-CIO.

Before: ADAMS, SLOVITER, and MANSMANN, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

### I.

### ISSUE

In *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), the Supreme Court held that the debtor-in-possession may reject its collective bargaining agreements, subject to the approval of the bankruptcy court which must balance the equities of the affected parties. Thereafter, following considerable debate and controversy, Congress enacted section 1113 of the Bankruptcy Code, 11 U.S.C. § 1113 (Supp. II 1984), which establishes the procedures to be followed and the conditions that must be met before the bankruptcy court may authorize such a rejection. On May 31, 1985, Wheeling-Pittsburgh Steel Corp., a debtor-in-possession under Chapter 11 of the Bankruptcy Code, sought authorization in the bankruptcy court to reject its collective bargaining agreements with the United Steelworkers of America, AFL-CIO-CLC ("Union" or "Steelworkers"). After a four-day hearing, the bankruptcy court authorized Wheeling-Pittsburgh to do so, finding that it had satisfied the requirements of the statute. The district court affirmed that order, and the Union appeals. Before us are important matters of first impression for an appellate court regarding the interpretation of the statute. Amici Curiae briefs have been filed by the American Federation of Labor and Congress of Industrial Organizations, and the Glass, Pottery, Plastics and Allied Workers International Union, AFL-CIO-CLC.

### II.

### FACTUAL BACKGROUND

Wheeling-Pittsburgh is the seventh largest steel manufacturing corporation in the United States. In the late 1970's, Wheeling-Pittsburgh began a major capital investment program to become one of the most modern and efficient major United States producers. The price of such efficiency was heavy borrowing. Wheeling-Pittsburgh's long-term debt increased from $170 million at the end of 1979 to $527 million at the end of 1984. A 1982 recession adversely affected the steel industry. The Company's losses in 1982, 1983 and 1984 and the need to pay principal and interest due on the modernization loans substantially weakened its financial position.

For some years, Wheeling-Pittsburgh and other major steel corporations, organized as the "Steel Company Coordinating Committee", have engaged in coordinated collective bargaining with the Steelworkers, and, as a result, their workers' wages and benefits were generally the same. Wheeling-Pittsburgh's average gross labor costs (including wages, benefits, current pension costs and other benefits for retirees, and payroll taxes) under the 1980 collective bargaining agreement were

about $25 per hour. Because of its financial problem, Wheeling-Pittsburgh asked the Union for concessions twice in 1982. The April concession consisted of a $1.65 an hour reduction in labor costs in return for entitlement to preferred stock which each employee could redeem when s/he quit, died or retired.

The December 1982 concession was made as part of a new three and a half year collective bargaining agreement scheduled to expire on July 31, 1986. It is that contract that is the subject of the dispute at issue before us. The Union agreed to concessions that reduced the average labor cost to $18.60 an hour at its lowest point. In return, Wheeling-Pittsburgh agreed to a profit sharing plan. The new agreement provided for gradual restoration of the Union concessions so that the average labor cost per hour would return to $25. By the end of 1984, the average labor cost had been restored to $21.40, and further restorations were due in 1985.

At the end of 1984, Wheeling-Pittsburgh again asked for concessions, this time the cancellation of all scheduled restorations. The Union agreed to defer restorations while its accounting firm, Arthur Young & Co., analyzed Wheeling-Pittsburgh's financial reports to determine the extent of its financial distress. When Arthur Young confirmed Wheeling-Pittsburgh's condition, the Union agreed to defer restorations indefinitely. In mid-January 1985, Wheeling-Pittsburgh asked the Union for a fourth reduction in labor cost. The Union, however, refused to make further concessions until Wheeling-Pittsburgh gained concessions from its lenders, who had made none to that date.

After mediation efforts, Wheeling-Pittsburgh issued a restructuring proposal on March 8, 1985, which sought concessions from the Union, the lenders, and shareholders. It asked the Union for a labor cost of approximately $19 for three years and cancellation of the restorations, with the employees to receive preferred or common stock in Wheeling-Pittsburgh in return. Wheeling-Pittsburgh asked all of its lend-

ers for a 100% moratorium on principal payments for 1985-1986, and some of its lenders for an additional 50% moratorium for 1987-1989, and/or reductions in interest, with the lenders to be given common stock in return. Significantly, the Company did not propose pledging its current assets for past debts. Wheeling-Pittsburgh also proposed a continued suspension of dividends to its preferred stockholders, elimination of preemptive rights for its common stockholders, and dilution of their present holdings to the extent necessary to compensate labor and lenders for their sacrifices.

The Union's counter-offer to Wheeling-Pittsburgh called for a two-year contract with labor costs of $19.50 the first year and $20.00 the second year; cancellation of the scheduled restorations; common stock as compensation; the right to appoint a member of Wheeling-Pittsburgh's Board of Directors; and Wheeling-Pittsburgh's promise not to pledge its current assets to the banks to secure the old debt. The Union believed the current assets were the "life preserver" needed to keep the Company and the employees' jobs afloat in the event of economic difficulties.

The lenders' counter-proposal to Wheeling-Pittsburgh called for deferment of about $210 million in outstanding indebtedness; $40 million in additional credit over the next four years; and Wheeling-Pittsburgh's pledging its current accounts receivable and inventory (about $300 million in value) to secure the entire debt. Neither the Union nor the lenders were willing to compromise on their respective positions concerning the pledge of current assets to secure the old loans, and the restructuring proposal collapsed. Wheeling-Pittsburgh filed a Chapter 11 petition for bankruptcy on April 16, 1985.

Thereafter, on May 9, 1985, Wheeling-Pittsburgh presented its proposal to the Union for modifying the current collective bargaining agreement. Wheeling-Pittsburgh proposed a five-year contract which included the following items: an average labor cost not to exceed $15.20 an hour; a

reduction in medical and insurance benefits, as part of the employment cost adjustment; elimination of supplemental unemployment benefit guarantees for employees with 20 or more years' service and cost-of-living adjustments; elimination of various other prior obligations, including payments of the pension plan, redemption fund and cash dividends on preferred stock; and elimination of the profit sharing plan. These proposals were accompanied by five-year forecasts far more pessimistic than those that had accompanied the restructuring proposal the Company had offered two months earlier in March, before the bankruptcy.

The Union hired Lazard Freres & Co. and Arthur Young & Co. to assist it in evaluating the Wheeling-Pittsburgh proposal and formulating a response. The financial advisors sought certain financial information from Wheeling-Pittsburgh, which provided some, but not all, of the requested information. On May 24, Wheeling-Pittsburgh announced it would provide no additional information, demanded the Union's response by May 30, and threatened to seek authorization to reject the agreement. When the Union replied that it could not respond until it had all the requested information, Wheeling-Pittsburgh filed its application with the bankruptcy court for authorization to reject the collective bargaining agreement on May 31, 1985.

The bankruptcy court held a hearing on Wheeling-Pittsburgh's motion from June 17–21, 1985. On July 17, 1985, it issued a decision authorizing Wheeling-Pittsburgh to reject the agreement. Wheeling-Pittsburgh did so, and announced that it would institute a $17.50 labor cost, effective immediately, and make various other changes. In response, the Union commenced a strike on July 21, 1985. It also appealed the decision of the bankruptcy court to the District Court for the Western District of Pennsylvania, which affirmed the bankruptcy court decision on August 28, 1985. The Union filed a timely appeal to this court.

On October 15, 1985, Wheeling-Pittsburgh and the Steelworkers reached a settlement which ended the strike. The settlement, which we need not describe in detail, included, *inter alia,* a new collective bargaining agreement providing for a labor cost of $18.00 per hour, to be effective "up to and including 10 days following the entry of an order confirming a plan of reorganization." Some of the other features of the agreement were a price escalation clause under which a labor cost bonus will be paid in relationship to increases in Wheeling-Pittsburgh's product prices; a pension relief program to aid retirees and beneficiaries in the likely event the current pension plan is terminated; and an employee buy-out protection plan for employees whose jobs have been permanently terminated as a result of reorganization. The Union received the right to "nominate" a member of Wheeling-Pittsburgh's Board of Directors, and several joint management-union committees were created. The settlement agreement also resolved various disagreements between Wheeling-Pittsburgh and the Union arising out of Wheeling-Pittsburgh's petition for bankruptcy and rejection of the 1983 collective bargaining contract and the resulting strike. Most significantly for present purposes, the settlement provided that if the Union were successful in reversing the courts' order authorizing rejection of the collective bargaining agreement, it would assert claims for lost pay of plant guards and others who worked during the strike.

The settlement agreement prompted the principal bank creditors to raise the issue of mootness, and, at their request, we permitted them to take discovery related to this issue during the pendency of the appeal. At oral argument, counsel for the principal bank creditors conceded that the appeal is not moot, and sought our permission to withdraw the request for dismissal on that ground. Since we have an independent obligation to determine whether there is an actual case or controversy before us, we consider that issue first, before turning to the merits.

## III.

### MOOTNESS

█ It has never been disputed that the settlement agreement between Wheeling-Pittsburgh and the Union which resolved the many outstanding issues between the parties, large and small, left unresolved the issue of wages paid to plant guards during the period of the strike from July 21, 1985 to October 15, 1985. When Wheeling-Pittsburgh rescinded the 1983 collective bargaining agreement and the other employees went out on strike, the plant guards had continued to work to protect the plants, as they were required to do under the old agreement. Wheeling-Pittsburgh, however, paid them at the new unilaterally instituted wage scale of $17.50 rather than at the old rate.

During the negotiations to settle the strike, the Union sought full reimbursement for the difference in the guards' pay between that paid during the work stoppage period and that which would have been paid under the old bargained rate, an amount the parties agree amounts to approximately $146,000. It appears from the recent discovery that the parties attempted, but were unable, to settle the plant guard payment issue during the negotiations. Therefore, they agreed to disagree. The language in the settlement agreement provides:

> In the event that the USWA is successful in reversing the order authorizing rejection of its Agreements, it will only assert expenses of administration claims for lost pay for plant guards or other employees who worked during the period July 21, 1985 through the settlement date.

Bank Creditors' Brief, Exhibit A, Appendix G at 4.

When the bank creditors were asserting their mootness argument, they argued that "[i]t defies rational belief that—having negotiated a contract that, based on a conservative estimate of hours likely to be worked, deals with some $360 *million* in pay and benefits ... the USWA and Wheel-ing-Pittsburgh were unable to compromise on the priority status of $146,000 of plant guard claims." Bank Creditors' Supplemental Brief on Mootness at 13–14. They argued that this single issue was purposefully left unresolved by Wheeling-Pittsburgh and the Union solely to allow continuation of the appeal, and therefore the plant guards issue is a "mere contrivance" rather than an actual controversy.

All parties acknowledge that if Wheeling-Pittsburgh does not prevail on appeal, it will be required to pay the $146,000 as an administrative expense. That sum is not de minimis for any company, and particularly not for a bankrupt one. Moreover, discovery showed that even after the settlement, and while this appeal was pending, the Union's counsel told the Company's counsel that if an offer were made in the full amount in dispute, the Union would accept it, even if it meant this appeal would become moot. The bank creditors, based on these facts and particularly the fact that Wheeling-Pittsburgh has not made and asserts it will not make an offer of any money to the Union in settlement of the guards' issue, concluded that they could not press the mootness issue.

A case becomes moot when "there is no subject-matter on which the judgment of the court can operate." *Ex parte Baez*, 177 U.S. 378, 390, 20 S.Ct. 673, 677, 44 L.Ed. 813 (1900). So long as a controversy is "definite and concrete, touching the legal relations of parties having adverse legal interests" and is "real and substantial ... admitting of specific relief through a decree of a conclusive character," it is justiciable rather than moot. *Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227, 240–41, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937). Because the validity of Wheeling-Pittsburgh's rejection of the collective bargaining agreement in July 1985 affects when and how much of the $146,000 the guards will receive, this case is not moot.

The Supreme Court has long held that the settling of a controversy does not render moot an unsettled subissue in the controversy. For example, in *Powell v.*

*McCormack,* 395 U.S. 486, 495–500, 89 S.Ct. 1944, 1950–53, 23 L.Ed.2d 491 (1969), the Court held that the seating of Congressman Powell as a member of the 91st Congress did not make moot his suit against the House of Representatives for failure to seat him in the 90th Congress because, *inter alia,* his back salary was still at issue. *See also Liner v. Jafco, Inc.,* 375 U.S. 301, 305–06, 84 S.Ct. 391, 394–95, 11 L.Ed.2d 347 (1964).

Although the Union has candidly admitted that it has an interest in securing a ruling on the merits of the appeal above and beyond the satisfaction of the plant guards' claims, its motivating interest in securing a precedent does not render the case nonjusticiable as long as there are, in fact, stakes at issue. Two recent cases illustrate this point. In *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982), the parties agreed while the petition for certiorari was pending to limit the damages sought for the alleged violations of the Fair Housing Act to a total of $1,200. The Court held, "If respondents have suffered an injury that is compensable in money damages of some undetermined amount, the fact that they have settled on a measure of damages does not make their claims moot. Given respondents' continued active pursuit of monetary relief, this case remains 'definite and concrete, touching the legal relations of parties having adverse legal interests.'" *Id.* at 371, 102 S.Ct. at 1120.

Another parallel is presented by *Nixon v. Fitzgerald,* 457 U.S. 731, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982). While the petition for certiorari was pending, petitioner Nixon paid Fitzgerald $142,000 in settlement, and the parties agreed that if the Court ruled that Nixon was not entitled to absolute immunity, Fitzgerald would accept liquidated damages of $28,000. The Court, relying on *Havens Realty Corp. v. Coleman, supra,* rejected the contention that the case was no longer justiciable, stating, "The limited agreement between the parties left both petitioner and respondent with a considerable financial stake in the resolution of the question presented in this Court." *Id.* at 744, 102 S.Ct. at 698.

Wheeling-Pittsburgh and the Union have a live disagreement about their claim to the disputed $146,000. The legal issues before us are being pursued with vigor. Representatives of all three interests, the Union, the Company, and the principal bank creditors, participated in the oral argument on the merits. We are satisfied that there are justiciable claims and that the appeal is not moot.

## IV.

### THE PROCEEDINGS BELOW

The issue before the bankruptcy court was whether Wheeling-Pittsburgh established by a preponderance of the evidence the necessary prerequisites for rejection of its collective bargaining agreement under section 1113. *In re Wheeling-Pittsburgh Steel Corp.,* 50 B.R. 969 (Bankr.W.D.Pa. 1985). The court analyzed Wheeling-Pittsburgh's application for rejection under section 1113 according to a nine-step process first enunciated in *In re American Provision Co.,* 44 B.R. 907, 909 (Bankr.D.Minn. 1984), and followed by other bankruptcy courts. It found that Wheeling-Pittsburgh had (1) submitted a proposal for modification; (2) "met with the Union negotiators on many occasions" thereafter; (3) negotiated with the Union in "good faith" because it made reasonable efforts to negotiate a voluntary modification and provided the Union the information necessary to evaluate its proposal in time to conduct meaningful negotiations; and (4) that Wheeling-Pittsburgh's proposal was based on the most complete and reliable information available. *Id.* at 975–77. On the hotly contested issue of (5) whether Wheeling-Pittsburgh's proposed modification was necessary for reorganization, the Union had argued that neither the proposed $15.20 per hour labor cost nor the five-year agreement was necessary for reorganization. The court found that because of the critical state of the United States steel industry and the deep financial difficulty of Wheeling-Pittsburgh, these provisions were

necessary to the maintenance of labor stability during the estimated five years needed for reorganization. *Id.* at 977–79. The court found that even though there was no clause providing for an upward labor rate adjustment if Wheeling-Pittsburgh rebounded financially, (6) all parties were treated "fairly and equitably" because creditors and salaried employees also made sacrifices for the reorganization. *Id.* at 979–80. The bankruptcy court rejected the Union's contention that it had been given insufficient information and time to consider the proposal. It found (7) that Wheeling-Pittsburgh had provided the Union with sufficient information to evaluate the proposal because the Union's financial analysts already possessed a wealth of detailed financial information about Wheeling-Pittsburgh previously given in connection with prebankruptcy concessions, and that the three weeks' time given was sufficient in the emergent situation. Consequently, the bankruptcy court concluded (8) that the Union refused to accept Wheeling-Pittsburgh's proposal without good cause. Finally, the court found (9) that the balance of the equities clearly favors rejection of the collective bargaining agreement because rejection "will have a significant and positive effect on Wheeling-Pittsburgh's prospects for reorganization." *Id.* at 983. The court stated that although rejection "will entail short term sacrifice on the part of employees ... in the long run they will benefit by a successful reorganization and a stable wage rate." *Id.* at 984.

The Union appealed to the District Court for the Western District of Pennsylvania, which affirmed the bankruptcy court's order approving Wheeling-Pittsburgh's rejection of its collective bargaining agreement with the Union. *In re Wheeling-Pittsburgh Steel Corporation,* 52 B.R. 997 (W.D.Pa.1985). The district court concentrated on three issues pressed by the Union. In considering whether Wheeling-Pittsburgh's proposed modifications of the collective bargaining agreement "are necessary to permit the reorganization of the debtor," it agreed with the bankruptcy court that the " 'necessary' standards of

§ 1113 does not mean 'absolutely essential,' " but instead encompasses a "more practical long range test of a less stringent nature." *Id.* at 1003. The court held that the bankruptcy court's determination that Wheeling-Pittsburgh met its burden of showing that the modifications proposed are necessary to permit its reorganization was not "clearly erroneous". *Id.* at 1003–04 & n. 1.

On the issue of whether Wheeling-Pittsburgh's proposal treated all of the affected parties fairly and equitably, the court stated that the bankruptcy court's conclusion that they were so treated did not "constitute[ ] a mistake which requires correcting by this Court." *Id.* at 1005. In regard to the Union's contention that the bankruptcy court erred in finding Wheeling-Pittsburgh had bargained in "good faith", the court stated that although there was testimony that would refute the bankruptcy court's findings of fact that Wheeling-Pittsburgh "did provide the Union with the information necessary to evaluate the proposal, did provide this information in time to conduct meaningful negotiations and did in fact make reasonable efforts to negotiate," those findings were not clearly erroneous. *Id.* at 1005–06.

## V.

### BACKGROUND OF 11 U.S.C. § 1113

The Union argues that both the bankruptcy court and the district court misinterpreted and misapplied 11 U.S.C. § 1113, the statute enacted by Congress in response to the Supreme Court's opinion in *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). A review of that opinion and the available legislative history of section 1113 are thus essential to consideration of the parties' contentions.

In *Bildisco,* the Court held that a collective bargaining agreement is an executory contract subject to rejection by a debtor-in-possession under section 365(a) of the Bankruptcy Code. It also held that "because of the special nature of a collective-bargaining contract," a somewhat stricter

standard than the traditional "business judgment" standard should govern the decision of the bankruptcy court to allow rejection of a collective bargaining agreement. *Id.* at 524, 104 S.Ct. at 1195. However, the Court rejected the argument of the Union and the NLRB that the standard for approval of the debtor's rejection should be the "very strict standard" adopted by the Second Circuit in *Brotherhood of Railway, Airline & Steamship Clerks v. REA Express, Inc.,* 523 F.2d 164, 167–69 (2d Cir.), *cert. denied,* 423 U.S. 1017, 96 S.Ct. 451, 46 L.Ed.2d 388 (1975), which required a showing that "rejection of the collective-bargaining agreement is necessary to prevent the debtor from going into liquidation." *NLRB v. Bildisco & Bildisco,* 465 U.S. at 525, 104 S.Ct. at 1196. The Supreme Court viewed this standard as "fundamentally at odds with the policies of flexibility and equity built into Chapter 11 of the Bankruptcy Code." *Id.* Instead, it approved the standard first used in *In re Brada Miller Freight System, Inc.,* 702 F.2d 890 (11th Cir.1983), that the bankruptcy court should permit rejection if "the debtor can show that the collective-bargaining agreement burdens the estate, and that after careful scrutiny, the equities balance in favor of rejecting the labor contract." *NLRB v. Bildisco & Bildisco,* 465 U.S. at 526, 104 S.Ct. at 1196.

The Court added that "the national labor policies of avoiding labor strife and encouraging collective bargaining" required the bankruptcy court to withhold acting on a petition to modify or reject a collective bargaining agreement until it was persuaded that "reasonable efforts to negotiate a voluntary modification have been made and are not likely to produce a prompt and satisfactory solution." *Id.* The court was authorized to act, however, "if the parties' inability to reach an agreement threatens to impede the success of the debtor's reorganization." *Id.* The Court required the bankruptcy court to make "a reasoned finding on the record" supporting its determination to permit rejection, and instructed the court to consider "the likelihood and consequences of liquidation for the debtor

absent rejection, the reduced value of the creditors' claims that would follow from affirmance and the hardship that would impose on them, and the impact of rejection on the employees." *Id.* at 527, 104 S.Ct. at 1197. It concluded that a debtor could reject the collective bargaining agreement before getting court approval without committing an unfair labor practice. *Id.* at 527–34, 104 S.Ct. at 1197–1200.

When the Supreme Court announced its decision in *NLRB v. Bildisco & Bildisco* on February 22, 1984, labor groups mounted an immediate and intense lobbying effort in Congress to change the law. *See generally* Ehrenwerth & Lally-Green, *The New Bankruptcy Procedures for Rejection of Collective-Bargaining Agreements: Is the Pendulum Swinging Back,* 23 Duq.L.Rev. 939, 950 (1985); Gibson, *The New Law on Rejection of Collective Bargaining Agreements in Chapter 11: An Analysis of 11 U.S.C. § 1113,* 58 Am.Bankr.L.J. 325, 326 (1984); Pulliam, *The Collision of Labor and Bankruptcy Law: Bildisco and the Legislative Response,* 1985 Lab.L.J. 390, 396–97; Rosenberg, *Bankruptcy and the Collective Bargaining Agreement—A Brief Lesson in the Use of the Constitutional System of Checks and Balances,* 58 Am.Bankr.L.J. 293, 312–23 (1984); White, *The Bildisco Case and the Congressional Response,* 30 Wayne L.Rev. 1169, 1190–98 (1984).

In the fall of 1983, even before the *Bildisco* decision, several members of Congress had expressed concern that some companies were using the bankruptcy law as a " 'new collective bargaining weapon.' " Rosenberg, *supra,* at 312 (quoting Daily Labor Report (BNA) No. 194 at A–6 (October 5, 1983)). At hearings of the Labor Management Relations and Labor Standards Subcommittees of House Education and Labor Committee, "six airline unions testified that employers were improperly using federal bankruptcy law." Rosenberg, *supra,* at 312. The *Bildisco* decision was announced on February 22, 1984 at the same time as a crisis in the federal bankruptcy system loomed. The Bankruptcy Act of 1978 had been declared unconstitutional in *Northern Pipeline Construction*

*Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), and the "interim rule" under which the bankruptcy courts had been kept in operation was due to expire March 31, 1984. *See* Pullium, *supra*, at 396–97; Rosenberg, *supra*, at 309–13; White, *supra*, at 1191. Labor advocates thus saw an opportunity to change the outcome of the *Bildisco* decision.

On February 22, 1984, Congressman Rodino introduced H.R. 4908 to "clarify the circumstances under which collective bargaining agreements may be rejected." 130 Cong.Rec. H809 (daily ed. February 22, 1984). That bill would have codified the *REA Express* rejection standard by allowing a company to reject a labor contract only when continuance of the contract would mean that "the jobs covered by such agreement will be lost and financial reorganization of the debtor will fail." H.R. 4908, 98th Cong., 2d Sess. at 3 *quoted in* Rosenberg, *supra*, at 313.

After several weeks of negotiations, Congressman Rodino introduced H.R. 5174 which "proposed to remedy the constitutional problem in the bankruptcy court system ... make certain changes in the bankruptcy law relating to personal bankruptcy, grain storage facility bankruptcy, and the rejection of collective bargaining agreements in Chapter 11 cases." Rosenberg, *supra*, at 314 (citations omitted); *see* 130 Cong.Rec. H1807–43 (daily ed. March 21, 1984). Section 277 of the bill, which was the basis of 11 U.S.C. § 1113, set forth procedures under which collective bargaining agreements could be rejected, and continued to incorporate the *REA Express* standard of rejection. H.R. 5174, 98th Cong.2d Sess., 130 Cong.Rec. 1832, 1842 (daily ed. March 21, 1984) ("jobs covered ... will be lost and any financial reorganization of the debtor will fail"). *See also* Rosenberg, *supra*, at 315.

The House passed H.R. 5174 on March 21. 130 Cong.Rec. H1854 (daily ed. March 21, 1984). The Senate version, however, was different and the two bodies were unable to reconcile those differences. Both Houses passed two more extensions of the interim rule to keep the bankruptcy courts going while they attempted to reach a compromise on the section dealing with rejection of labor agreements. *See* Rosenberg, *supra*, at 315–16. Senators Thurmond and Packwood each introduced amendments of H.R. 5174, U.S.Code Cong. & Admin.News 1984, p. 576. Senator Thurmond's proposal would have adopted the *Bildisco* standard and have made little change beyond requiring a debtor to wait 30 days after filing a motion to reject before it could abrogate the agreement. 130 Cong.Rec. S6081–82, S6126 (daily ed. May 21, 1984); Rosenberg, *supra*, at 317. Senator Packwood's amendment, on the other hand, proposed a standard whereby rejection was permitted only if the debtor's proposal contained "such 'minimal modifications in the contract that would permit the reorganization, taking into account the best estimate of the sacrifices expected to be made by all classes of creditors and other affected parties.'" Rosenberg, *supra*, at 317 (quoting 130 Cong.Rec. S6181–82 (daily ed. May 22, 1984)).

Continuing stalemate caused Congress to pass yet another extension of the bankruptcy system until June 20. 130 Cong.Rec. H4840–43; S6427–28 (daily ed. May 24, 1984). On June 19, the Senate passed a bill that dealt with other bankruptcy issues in a manner similar to that provided in H.R. 5174 but which avoided siding with either Senators Thurmond or Packwood by omitting any provision on the collective bargaining issue. 130 Cong.Rec. S7617–25 (daily ed. June 19, 1984). This was to permit the Conference Committee to address the issues. The Conference Committee then produced a bill that passed both Houses of Congress. *See* 130 Cong.Rec. H7489, H7499–500, S8887, S8900 (daily ed. June 29, 1984); Rosenberg, *supra*, at 318–21.

As enacted, the new section on collective bargaining agreements, section 1113, provides that a debtor-in-possession may assume or reject a collective bargaining agreement only by following the provisions of the statute. *See* 11 U.S.C. § 1113(a). The subsections at issue in this appeal read as follows:

> (b)(1) Subsequent to filing a petition and prior to filing an application seeking

rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section 'trustee' shall include a debtor in possession), shall—

(A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protection that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and

(B) provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.

(2) During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.

(c) The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that—

(1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);

(2) the authorized representative of the employees has refused to accept such proposal without good cause; and

(3) the balance of the equities clearly favors rejection of such agreement.

11 U.S.C. § 1113(b) & (c) (Supp. II 1984). The remainder of the section is set forth in the margin: [1]

## VI.

## DISCUSSION

A. *Whether Consideration of the Proposal Can be Pretermitted*

At the outset, we must consider the Union's argument that Wheeling-Pittsburgh

---

1. § 1113. Rejection of collective bargaining agreements ...

(d)(1) Upon the filing of an application for rejection the court shall schedule a hearing to be held not later than fourteen days after the date of the filing of such application. All interested parties may appear and be heard at such hearing. Adequate notice shall be provided to such parties at least ten days before the date of such hearing. The court may extend the time for the commencement of such hearing for a period not exceeding seven days where the circumstances of the case, and the interests of justice require such extension, or for additional periods of time to which the trustee and representative agree.

(2) The court shall rule on such application for rejection within thirty days after the date of the commencement of the hearing. In the interests of justice, the court may extend such time for ruling for such additional period as the trustee and the employees' representative may agree to. If the court does not rule on such application within thirty days after the date of the commencement of the hearing, or within such additional time as the trustee and the employees' representative may agree to, the trustee may terminate or alter any provisions of the collective bargaining agreement pending the ruling of the court on such application.

(3) The court may enter such protective orders, consistent with the need of the authorized representative of the employee to evaluate the trustee's proposal and the application for rejection, as may be necessary to prevent disclosure of information provided to such representative where such disclosure could compromise the position of the debtor with respect to its competitors in the industry in which it is engaged.

(e) If during a period when the collective bargaining agreement continues in effect, and if essential to the continuation of the debtor's business, or in order to avoid irreparable damage to the estate, the court, after notice and a hearing, may authorize the trustee to implement interim changes in the terms, conditions, wages, benefits, or work rules provided by a collective bargaining agreement. Any hearing under this paragraph shall be scheduled in accordance with the needs of the trustee. The implementation of such interim changes shall not render the application for rejection moot.

(f) No provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section.

11 U.S.C. § 1113(d)–(f).

failed to make the threshold showing needed under section 1113 to entitle it to reject the collective bargaining agreement. The Union asserts that undisputed evidence showed that Wheeling-Pittsburgh could have adhered to that agreement for its remaining 13 months and still have had sufficient cash to operate for both the short and long term. It further asserts that even if assets were reduced by some $80 million as a result of the adherence to the labor contract, creditors could not rationally have preferred liquidation to reorganization. Accordingly, the Union contends that no modification could be "necessary", and that the bankruptcy court erred in even evaluating Wheeling-Pittsburgh's proposal under section 1113.

■ We need not decide in this part the validity of the Union's characterization of the state of the record, because we do not agree with the Union's statutory analysis in regard to the procedure to be followed. Nowhere in the statute is there a requirement that the bankruptcy court make a preliminary determination regarding the necessity of any changes in the collective bargaining agreement before the debtor's proposal must be made or evaluated. The statutorily mandated sequence of steps to be followed after a Chapter 11 petition has been filed is: the trustee (or debtor-in-possession) who seeks to reject a collective bargaining agreement must make a proposal for modification thereto "prior to filing an application for rejection;" the court must schedule a hearing within a specified time for consideration of the application for rejection; the trustee and the Union must negotiate during the interval between the making of the proposal and the hearing; and the court must rule on the application within 30 days of the hearing, subject to agreed upon extensions.

The only provision for any preliminary determination appears in section 1113(e). At the same time that Congress overturned the part of *Bildisco* that held that a debtor could unilaterally reject a labor contract, and provided instead that the agreement remains in force until the bankruptcy court

has authorized its rejection, Congress recognized that there might be immediate problems of an emergency nature in individual cases. Thus, section 1113(e) provides that the bankruptcy court may authorize interim changes in the terms, conditions, wages, benefits or work rules provided by a collective bargaining agreement if the court finds, following a hearing, that an interim change is "essential to the continuation of the debtor's business, or in order to avoid irreparable damage to the estate." 11 U.S.C. § 1113(e).

■ The focus for the ultimate issue of the debtor's application for rejection is different. In section 1113(c), the statute directs the court to determine whether the "proposal" meets the substantive standard of section 1113(b)(1). The bankruptcy court correctly recognized, "[T]he question is *not* simply whether Wheeling-Pittsburgh can continue to pay the $21.40 rate required by the current *collective bargaining agreement* and still emerge with enough cash in hand at the expiration of the contract term to meet current operational expenses," but instead is "whether it is necessary for Wheeling-Pittsburgh to pay the $15.20 rate found in its *proposal* in order to successfully reorganize." *In re Wheeling Pittsburgh*, 50 B.R. at 978 (emphasis in original).

Of course, when the bankruptcy court considers whether a specific proposal of modifications is "necessary" under the substantive standard set forth in section 1113, it will have to decide if the debtor has shown that any modifications are necessary. However, we reject the Union's suggestion that the legislative history showing an intent to overrule, in part, the *Bildisco* opinion should also be interpreted as requiring the bankruptcy court to make a preliminary determination independent of the statutorily required sequence of steps. The statutory language clearly requires that necessity *vel non* must be evaluated in the context of a specific proposal of modifications, and the statute does not either explicitly or implicitly provide for pretermitting evaluation of the debtor's proposal.

B. *Whether the Proposed Modifications Were "Necessary" and Treated All Parties "Fairly and Equitably"*

Under section 1113(b)(1), the debtor's proposal antecedent to its filing an application for rejection of a collective bargaining agreement must be one that "provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably." 11 U.S.C. § 1113(b)(1)(A). The Union's contention that Wheeling-Pittsburgh's proposal was neither "necessary" nor treated all parties "fairly and equitably" was rejected by both the bankruptcy court and the district court.

The parties offer widely varying interpretations of "necessary". Because the statute contains no definition, we must turn to the legislative history for enlightenment. We are aware, of course, that the most authoritative source of legislative intent lies in committee reports. *See, e.g., Garcia v. United States*, 469 U.S. 70, ——, 105 S.Ct. 479, 483, 83 L.Ed.2d 472 (1984). In this instance, however, there was no committee report, and we must seek guidance from the sequence of events leading to adoption of the final version of the bill, and the statements on the House and Senate floor of the legislators most involved in its drafting. Although we previously summarized the sequence of events leading to the passage of section 1113, *see* Part V, *supra,* concentration on the substantive provisions of the various bills and amendments offers significant guidance to construction of the statutory language.

In *Bildisco*, the Supreme Court had rejected the Second Circuit's "stringent test" for "necessity" to be used in adjudicating petitions to reject labor contracts. Instead, the Supreme Court opted for a test which permitted rejection if "the equities balance in favor of rejecting the labor contract." *Bildisco*, 465 U.S. at 526, 104 S.Ct. at 1196.

It was this lenient standard that caused the labor forces to mobilize on Congress.

The day the *Bildisco* decision was announced, Representative Rodino, Chairman of the House Judiciary Committee with jurisdiction over bankruptcy legislation, introduced a bill to overturn that decision. 130 Cong.Rec. H809 (daily ed. February 22, 1984). He decried "[t]he balancing-of-the-equities standard adopted by the Supreme Court" because it would give "no special weight to collective bargaining interests and the significant concerns underlying the national labor policy." *Id.* at H780.

The February bill was ultimately incorporated into a comprehensive bankruptcy bill, H.R. 5174, known as the Bankruptcy Amendments of 1984. *See generally id.* at H1721–23, H1795–1854 (daily ed. March 19, 21, 1984) (House debate). The expanded bill passed the House on March 21. When it reached the Senate, Senator Thurmond offered an amendment which would have "preserve[d] the balancing of the equities standard for rejection of such contracts." *Id.* at S6082 (May 21, 1984). Senator Packwood offered a substitute amendment which required the trustee's proposal to make the "minimum modifications in [the] employees' benefits and protections that would permit the reorganization," *id.* at S6181–82 (daily ed. May 22, 1984), and was recognized to represent the position of organized labor on this issue. *See id.* at S6192, S6194 (daily ed. May 22, 1984) (remarks of Sens. DeConcini and Thurmond); *id.* at S8898 (daily ed. June 29, 1984) (remarks of Sen. Kennedy). Senator Packwood based his proposal on the approach suggested by Professor Vern Countryman of the Harvard Law School. *See id.* at S6181 (daily ed. May 22, 1984) (quoting Bordewieck & Countryman, *The Rejection of Collective Bargaining Agreements by Chapter 11 Debtors*, 57 Am.Bankr.L.J. 293 (1983)). This approach argues for a strong presumption against rejection of labor contracts on the ground that rejection seriously undercuts fundamental aspects of federal labor policy which should be permitted "only in extraordinary cases." *See* 130 Cong.Rec. S6185 (daily ed. May 22, 1984)

(quoting Bordewieck & Countryman, *supra*, at 299–300).

As noted previously, the Senate bill went to conference without any collective bargaining provision, but the Conference Committee eventually emerged with the provision now embodied in the language of section 1113. To ascertain the meaning of the language ultimately adopted, it is instructive to examine the language of the proposals that were rejected. Senator Thurmond's amendment would have permitted rejection of a labor contract if the court found, *inter alia*, "that the inability to reach an agreement threatens to impede the success of the [debtor's] reorganization." 130 Cong.Rec. S6084 (daily ed. May 21, 1984). The Thurmond proposal stems from the language of *Bildisco*, where the Court said, "Since the policy of Chapter 11 is to permit successful rehabilitation of debtors, rejection should not be permitted without a finding that the policy would be served by such action." *Bildisco*, 465 U.S. at 513, 104 S.Ct. at 1191.

In contrast, the Rodino bill would have conditioned rejection of a collective bargaining agreement on a showing that absent such rejection "the jobs covered by such agreement will be lost and any financial reorganization of the debtor will fail." 130 Cong.Rec. H1942 (daily ed. March 26, 1984) (remarks of Rep. Rodino). This stems from the language of the Second Circuit's *REA Express* opinion that rejection should be authorized only when the debtor shows that "unless the agreement is rejected, the [employer] will collapse and the employees will no longer have their jobs." *REA Express*, 523 F.2d at 172.

The Packwood amendment, supported by labor, provided that the debtor's proposal should contain "the minimum modifications in such employees' benefits and protections that would permit the reorganization." 130 Cong.Rec. S6181–82 (daily ed. May 22, 1984). As a substitute for this clause, the Conference Committee proposed, and section 1113 provides, that the debtor's proposal provide "for those necessary modifications in the employees' benefits and protections that are necessary to permit the reorganization of the debtor." § 1113(b)(1)(A). This was seen as a victory for labor.

The contemporaneous remarks of the conferees made it clear that the provision was based on the substance of Senator Packwood's proposal. Thus, Senator Thurmond, who presented the conference report to the Senate, explained that the Senate conferees had been required to accept a bankruptcy bill, if there was to be one at all, that contained "a labor provision acceptable to organized labor", and that the provision was one whose "procedures *and* standard are essentially the same as those of the Packwood amendment." *Id.* at S8888 (daily ed. June 29, 1984) (emphasis added). Senator Packwood himself was "pleased that the approach contained in the amendment I offered was, for the most part, adopted by the conferees." *Id.* at S8898.

Congressman Rodino, in submitting H.R. 5174 (or the Bankruptcy Amendments of 1984) as it came from the Conference Committee, stated: "[t]he provision requires the trustee to propose only those modifications that are necessary. The proposed modification must be necessary to the reorganization of the debtor...." 130 Cong. Rec. H7489 (daily ed. June 29, 1984), U.S. Code Cong & Admin. News 1984, p. 577. Congressman Fish noted, "the debtor must make a proposal to the union which makes the modifications necessary for reorganization of debtor." 130 Cong.Rec. H7490 (daily ed. June 29, 1984. Congressman Morrison, who together with Congressman Hughes provided the compromise language between the House and Senate versions of section 1113, emphasized that the "necessary" provision "makes plain that the trustee must limit his proposal to modify a collective bargaining agreement to only those modifications that *must be accomplished* if the reorganization is to succeed. The key phrase is 'necessary' modifications." 130 Cong.Rec. H7496 (daily ed. June 29, 1984) (emphasis added).

In the Senate, Senator Kennedy referred to the analysis of Representative Morrison. He commented that "The conference agreement parallels the Packwood amendment and achieves the aim of that amendment . . . to overturn the Bildisco decision which had given the trustee all but unlimited discretionary power ♣to repudiate labor contracts." *Id.* at S8898–99.

> Senator Packwood himself noted that: only modifications which are necessary to a successful reorganization may be proposed. Therefore, the debtor will not be able to exploit the bankruptcy procedure to rid itself of unwanted features of the labor agreement that have no relation to its financial condition and its reorganization and which earlier were agreed to by the debtor. The word "necessary" inserted twice into this provision clearly emphasizes this required aspect of the proposal which the debtor must offer and guarantees the sincerity of the debtor's good faith in seeking contract changes.

130 Cong.Rec. S8898 (daily ed. June 29, 1984).

> Senator Moynihan added that:
> [A debtor's] proposal must provide for the necessary modifications in employee benefits and protections to enable the employer to continue operating.
>
> Mr. President, this provision is a most important one, worthy of this body's support, for it ensures that a company's workers will not have to bear an undue burden to keep the company solvent. The union would have to make the *necessary* concessions. Nothing more. Nothing less.

130 Cong.Rec. S8900 (daily ed. June 29, 1984) (emphasis added).

Only Senator Hatch, who had been a supporter of the Thurmond amendment, viewed the conference bill as a return to the *Bildisco* decision which permitted rejection based on "the likelihood of a successful reorganization." *See id.* at S8891–92. These remarks, whatever their intent, swim against the tide of members of Congress who expressed an otherwise pervasive understanding that the substantive standard of *Bildisco* had been overturned and that the *REA Express* standard, or something close to it, had been reinstated. *See also* Ehrenwerth & Lally-Green, *supra,* at 953–54 ("critical issue . . . is not whether the proposed modifications will result in a reduction of operating costs but whether they are necessary to permit the debtor's reorganization"); Gibson, *supra,* at 337–38 ("it is clear that the debtor must be prepared to justify each of its proposed modifications in terms of a rational plan of reorganization").

The legislative history illuminates two aspects of the court's inquiry into necessity: (1) the standard to be applied, *i.e.*, "*how* 'necessary' " must the proposed modifications be, and (2) the object of the "necessary" inquiry, *i.e.*, " 'necessary' *to what*."

■ The "necessary" standard cannot be satisfied by a mere showing that it would be desirable for the trustee to reject a prevailing labor contract so that the debtor can lower its costs. Such an indulgent standard would inadequately differentiate between labor contracts, which Congress sought to protect, and other commercial contracts, which the trustee can disavow at will. The congressional consensus that the "necessary" language was substantially the same as the phrasing in Senator Packwood's amendment, which looked to the "minimum modifications . . . that would permit the reorganization," requires that "necessity" be construed strictly to signify only modifications that the trustee is constrained to accept because they are directly related to the Company's financial condition and its reorganization. We reject the hypertechnical argument that "necessary" and "essential" have different meanings because they are in different subsections. The words are synonymous.

The question of " 'necessary' to what" is not easily answered by reference to the statutory language which merely provides "necessary to permit the reorganization of the debtor." It is significant that the Thurmond amendment, which the conferees did not accept, and *Bildisco*, which they clearly

sought to modify, seemed directed to the successful rehabilitation of the debtor, which suggests focus on the long-term economic health of the debtor. While we do not suggest that the general long-term viability of the Company is not a goal of the debtor's reorganization, it appears from the legislators' remarks that they placed the emphasis in determining whether and what modifications should be made to a negotiated collective bargaining agreement on the somewhat shorter term goal of preventing the debtor's liquidation, the mirror image of what is "necessary to permit the reorganization of the debtor." This construction finds additional support in the conferees' choice of the words *"permit* the reorganization," which places the emphasis on the reorganization, rather than the longer term issue of the debtor's ultimate future.

■ It is also important to note that the requirement that the proposal provide only for "necessary" modifications in the labor contract is conjunctive with the requirement that the proposal treat "all of the affected parties ... fairly and equitably." The language as well as the legislative history makes plain that a bankruptcy court may not authorize rejection of a labor contract merely because it deems such a course to be equitable to the other affected parties, particularly creditors. Such a construction would nullify the insistent congressional effort to replace the *Bildisco* standard with one that was more sensitive to the national policy favoring collective bargaining agreements, which was accomplished by inserting the "necessary" clause as one of the two prongs of the standard that the trustee's proposal for modifications must meet.

■ In its challenge to the court's finding that the debtor's proposal satisfied the "necessary" prong, the Union contends that Wheeling-Pittsburgh's available and projected cash shows that no modifications at all were necessary. Although the Company's cash position may be a relevant factor, it is not the only factor in determining whether any modifications are necessary. As the bankruptcy court pointed out,

the cash availability to which the Union points was created by the reorganization proceeding. *In re Wheeling-Pittsburgh,* 50 B.R. at 977. Congress cannot have intended the bankruptcy court to hold all other parties at bay, while pointing to the resulting cash as the reason why no modifications to the labor contract are needed.

The Union next argues that Wheeling-Pittsburgh's proposal did not contain only "those necessary modifications ... necessary to permit the reorganization of the debtor", not only because the Company failed to prove a need for relief from the collective bargaining agreement, but also because the proposal (1) called for a five-year agreement with drastically reduced labor costs, (2) was based on conservative projections under which labor cost reductions in the amount proposed would be needed only if Wheeling-Pittsburgh's actual experience conformed to the "worst case" scenario, and (3) failed to contain a "snap back" provision for additional compensation to the employees if Wheeling-Pittsburgh's performance turned out to be better than predicted. The Union is on firmer ground with this argument.

The Union's uncontradicted evidence was that a five-year contract was neither the practice of Wheeling-Pittsburgh nor that of the steel industry in general. In fact, a Vice-President of Wheeling-Pittsburgh who was its labor negotiator admitted that he had tried to get the Union to agree to a five-year term in bargaining but had been unsuccessful. JA at 140. Nonetheless, the bankruptcy court found "that the five year term is necessary for the debtor's reorganization" because "Wheeling-Pittsburgh's period of reorganization likely will last *at least* five years," labor stability would be necessary during the reorganization period, and "there is no evidence as to how labor stability can be achieved with a contract of less than five years' duration." *In re Wheeling-Pittsburgh,* 50 B.R. at 979.

The bankruptcy court accepted the Company's pessimistic projection of its performance over the next five years because of its findings that the United States steel indus-

try is in "very critical shape; the price of steel ... has declined; rising steel imports have cut into the domestic steel market despite federal 'dumping' laws; steel plant shutdowns are growing more numerous ...; and the most optimistic forecasts predict only relatively small market improvements." *Id.* at 978. These conditions, and the fact that Wheeling-Pittsburgh has sustained significant losses over the last three years, led the court to reject the optimistic assessment of the Union's experts. *Id.* at 978–79.

We do not understand the Union to challenge the necessity of drastically lower labor costs if the "worst case" scenario eventuates. In any event, a reviewing court might be hard-pressed to regard such a finding as clearly erroneous.

The Union's principal emphasis is on the failure of the proposal to contain any "snap back" provision which would increase employees' wages or benefits in the event the Company performed more favorably than anticipated. The Union claims that each of the three prior agreements it had made with Wheeling-Pittsburgh in which it granted concessions had contained either profit sharing and/or equity in compensation for concessions made. Moreover, the proposal that Wheeling-Pittsburgh had given the Union in March 1985, immediately preceding the bankruptcy, had contained such a feature.

■ Wheeling-Pittsburgh has offered no credible explanation why its proposal did not contain a "snap back" provision. Even more troubling is the fact that the bankruptcy court's discussion of "necessity" does not even mention this issue. The court confined its consideration of the absence of a "snap back" provision to its discussion of the second prong of the standard, whether the proposal treated all affected parties "fairly and equitably." In failing to focus on the Union's contention

about the "snap back" provision when deciding whether the modifications were "necessary", the bankruptcy court erroneously treated the two prongs of the standard as disjunctive rather than conjunctive. We find it difficult, on the basis of this record, to accept the court's finding that it was "necessary" to modify an existing labor contract by providing an unusually long five-year term at markedly reduced labor costs based on a pessimistic five-year projection without at least also providing for some "snap back" to compensate for workers' concessions. Such a finding cannot be sustained in light of the court's failure to consider the Union's argument regarding a "snap back" in the context of the "necessary" inquiry.

Furthermore, it appears that the bankruptcy court was still applying a substantive standard closer to, if not taken directly from, *Bildisco* rather than a standard informed by the legislative history. The court consistently framed the issue and goal in terms of *"successful* reorganization", *see id.* at 978, in a manner which implied it was looking to the long-term economic health of the Company rather than the feasibility of reorganization as such.

Nor can we say with certainty that the district court recognized the appropriate standard of "necessity", since at times it referred to the goal of "prevention of the debtor going into liquidation," *see In re Wheeling-Pittsburgh,* 52 B.R. at 1003, but it also approved the standard of "necessity" used by the bankruptcy court. *Id.*[2] The district court appeared to regard the congressional response to *Bildisco* as limited to prevention of the trustee's unilateral rejection of the contract before formal rejection by the bankruptcy court. *Id.* at 1004. Apparently, the court failed to ap-

---

**2.** Inexplicably, the reported copy of the district court's opinion fails to distinctly separate that court's discussion from its lengthy verbatim quote from the opinion of the bankruptcy court, which begins at 52 B.R. at 1001 and ends in the middle of the second column of page 1003.

Although the district court's opinion notes the beginning and end of the quotation, the published copy does not contain either indentation or quotation marks which would assist the reader in making the distinction.

preciate Congress' substantial modification of the standard for rejection.

Moreover, the district court treated the bankruptcy court's findings of "necessity" as factual findings, subject only to "clearly erroneous" review. The finding as to whether the modifications were "necessary" should have been reviewed as a mixed question of law and fact. To the extent that the bankruptcy court applied the wrong statutory standard and failed to consider all of the relevant factors in making its finding of necessity, it committed an error of law. Therefore, we are obliged to return the case to that court.

■ The Union again points to the absence of a "snap back" provision in arguing that the bankruptcy court erred in finding that the proposal met the second prong of the substantive standard. This requires that the proposal "assure[ ] that all creditors, the debtor and all of the affected parties are treated fairly and equitably." 11 U.S.C. § 1113(b)(1)(A). The Union argues that Wheeling-Pittsburgh's proposed modifications were not "fair and equitable" to the employees because the lack of a "snap back" provision in a five-year agreement predicated on worst-case assumptions meant that any improvement in the Company's position over this long period would not be shared by the employees.

The "fair and equitable" determination will often be based on subsidiary findings of fact, reviewable under the clearly erroneous standard, but also entails the exercise of discretion in making the required balancing. In reviewing the latter aspect of the determination, we must look to whether the bankruptcy court considered the correct factors, and gave them appropriate weight in the circumstances.

Congressional intent with regard to the meaning of "fair and equitable" is reflected in the comments of Congressman Morrison who stated that:

language that requires assurance that "All creditors, the debtor and other affected parties are treated fairly and equitably." ... would ensure that, where the trustee seeks to repudiate a collective bargaining agreement, the covered employees do not bear either the entire financial burden of making the reorganization work or a disproportionate share of that burden, but only their fair and equitable share of the necessary sacrifices.

130 Cong.Rec. H7496 (daily ed. June 29, 1984). As Senator Packwood explained:

The second requirement of the proposal—that it assure fair and equitable treatment for all creditors, the debtor and other affected parties ... guarantees that the focus for cost cutting must not be directed exclusively at unionized workers. Rather the burden of sacrifices in the reorganization process will be spread among all affected parties. This consideration is desirable since experience shows that when workers know that they alone are not bearing the sole brunt of the sacrifices, they will agree to shoulder their fair share and in some instances without the necessity for a formal contract rejection.

130 Cong.Rec. S8898 (daily ed. June 29, 1984).

The bankruptcy court recognized that the focus of inquiry as to "fair and equitable" treatment should be whether the Company's proposal would impose a disproportionate burden on the employees.[3] *In re Wheeling-Pittsburgh*, 50 B.R. at 980. The Union does not challenge the articulation of the standard, but instead contends that the court misapplied the standard when it concluded that "[t]he burden on the Union employees is not disproportionate from the burden on other affected parties." *Id.*

It has been suggested by some commentators that the court should undertake "a comparison of the concessions asked of the

---

**3.** Although there is "fair and equitable" language in other sections of the bankruptcy statute, the construction of these words in § 1113 is not aided by reference to the other sections.

For example, "fair and equitable" is specifically defined in 11 U.S.C. § 1129(b)(2) in terms of priority of claims, patently inapplicable here.

Union, on a dollar or percentage basis, with those sought from other affected parties." Ehrenwerth & Lally-Green, *supra,* at 955. From the debtor's standpoint, it may be possible to compare the amount or percentage of its cost reduction from various sources during reorganization. But when examining the fairness and equity to the parties who are making concessions, as section 1113 also requires us to do, we are uncertain of the basis for comparison in either dollar or percentage terms.

Of course, wage reductions by one group of employees, such as hourly unionized workers, can be compared with wage reductions by another group, such as non-unionized salaried employees. The bankruptcy court stated that "salaried employees have been without wage increases since about 1981, and took a 10% reduction in 1982, half of which was restored in 1984." *In re Wheeling-Pittsburgh,* 50 B.R. at 980. The court did not directly compare this concession to that made by the hourly workers, who had been at a $25 rate in 1982 when first asked to make concessions, and who were at a $21.40 rate at the time of the bankruptcy in 1984 when Wheeling-Pittsburgh made its proposal for a $15.20 rate. Nonetheless, the court's findings that the salaried employees are leaving for better paying jobs elsewhere and that the Company has difficulty finding qualified replacements may satisfactorily support its conclusion that no further sacrifices from the salaried employees are warranted, *id.,* even though it failed to make the possible comparison between the concessions of the different groups of employees in dollar amount or percentages.

On the other hand, we do not know whether the percentage of interest foregone by creditors during reorganization may fairly be considered comparable with the percentage of reductions in wages taken by workers. We cannot accept *ipso facto* the commentators' suggestion that such matters are capable of comparison by percentage or in dollars. Neither the bankruptcy court nor the district court discussed this issue, and the bankruptcy court referred to the concessions in absolute,

rather than relative, terms. In referring to the projected reorganization plan, it stated that "Creditors ... are to be subjected to a 50% loss amounting to losses of some $250 million, with the 50% balance payable over 10 years." *Id.* at 980. The Union's witnesses referred to the employees' sacrifice during the projected five-year term as close to $600 million. JA at 581. Considerably more economic expertise would have to be addressed to the comparability of the concessions of each group before we could fault the court for failing to make a direct comparison between creditors and labor on a dollar or percentage basis.

There are, however, other comparisons that the court did not adequately consider. The Union argues that even if the sacrifices made by the workers and the creditors are viewed as proportionate in the event the Company's worst-case forecast proves to be accurate, the workers would suffer disproportionately to the creditors if the Company in fact fared better than its forecast. Under Wheeling-Pittsburgh's proposal, labor costs would remain frozen. One of the Union's witnesses, a general partner with the investment banking firm of Lazard-Freres & Company, testified that based on his experience with other Chapter 11 reorganizations, excess cash beyond what was needed to operate would go to pay off the creditors. JA at 583. The bankruptcy court did not discredit this testimony. Its only discussion of what seems on its face to be a serious inequity was as follows:

> It is relevant to note that the proposal also does *not* provide for any downward adjustment below the $15.20 in the event the Company continues to lose money. The steel industry and this Company are in serious financial trouble. It might not be inequitable to ask hourly employees to share in future shortfalls, but that has not been done. In any event, the proposal provides cost stability for the Company, and also provides wage stability for Union workers.

50 B.R. at 980 (emphasis in original).

This is not persuasive. The workers did not ask for or need "wage

stability" at a rate they considered substandard. Therefore, such "stability" cannot be considered to be a benefit to them to compensate for the absence of any share of better-than-anticipated recovery. Similarly, since the entire proposal was predicated on a worst-case economic scenario, there was no record basis from which the bankruptcy court could hypothesize a possible need for "any downward adjustment." Equity demands that concessions and benefits to the various interested parties be examined from a realistic standpoint and on the basis of record evidence.

■■■ The district court did not independently discuss the "fair and equitable" issue. It simply quoted the bankruptcy court's opinion and added that:

> Our review of the record does not produce a conviction that the proposed plan will place a burden upon the employees disproportionate from that burden on other affected parties or that Judge Bentz's conclusion ... [that it is fair and equitable] constitutes a mistake which requires correcting by this Court.

*In re Wheeling-Pittsburgh,* 52 B.R. at 1005. However, as we pointed out above, the proposal's failure to provide workers a share in a possible recovery, is particularly significant in this case since the proposal asked workers to take substantial reductions over a five-year period based on extremely pessimistic forecasts. The bank creditors argue that the proposal contains a "snap back" in that the Union's claim as a pre-petition unsecured creditor for the reduction in wages and benefits during the 13 month period left on the old contract, could be repaid at a higher level. But an unsecured claim is not equivalent in kind to a "snap back", which is based on the principle that all of the concessions sought may not turn out to be necessary. In the circumstances of this case, the bankruptcy court's failure to recognize the need for some parity in this regard flaws the court's conclusion that the proposal was "fair and equitable." Therefore, we cannot affirm the district court's order approving the debtor's rejection of the collective bargaining agreement.

### C. *Whether the Procedural Test of Section 1113 Was Satisfied*

■■■ Section 1113 imposes on a debtor certain procedures when it presents its proposal for modifications of the collective bargaining agreement. A debtor must provide "the representative of the employees with such relevant information as is necessary to evaluate the proposal," 11 U.S.C. § 1113(b)(1)(B), and "meet ... to confer in good faith in attempting to reach mutually satisfactory modifications." 11 U.S.C. § 1113(b)(2). The purpose of the requirement that the debtor supply the relevant information was intended to encourage negotiation between the Company and the Union rather than permit a unilateral repudiation. *See, e.g.,* 130 Cong.Rec. S8990 (daily ed. June 29, 1984) (remarks of Sen. Moynihan). We agree with the Union that the debtor must meet its negotiating obligation before the court may approve its rejection of the labor contract.

The Union asserts that the bankruptcy court erred in ruling that Wheeling-Pittsburgh satisfied the procedural requirements of section 1113. It complains that the three-week period that it was given to evaluate Wheeling-Pittsburgh's proposal was inadequate and that Wheeling-Pittsburgh did not provide it with the necessary relevant information. The bankruptcy court rejected the Union's contentions, finding that "a three week negotiation period by itself is not inherently unreasonable." *In re Wheeling-Pittsburgh,* 50 B.R. at 976.

■■■ We agree with that court that the time for negotiation must depend on the circumstances of the particular case. However, the court was unduly concerned about the need for haste, stating "[t]hree weeks was sufficient time in this emergent situation." *Id.* at 982. Section 1113(e) provides an adequate procedure to cope with an emergency situation, and Wheeling Pittsburgh made no application under this section. Thus, the need for haste in itself

cannot support the finding that Wheeling Pittsburgh met its negotiating obligation.

 The court also found that Wheeling-Pittsburgh did provide the Union with the information necessary to evaluate the proposal. *Id.* at 976–77. Although the Union argues, with some persuasion, that the bankruptcy court misinterpreted the evidence, we would not be prepared to hold the court's finding to be clearly erroneous. However, because the court may have given undue weight to the factor of the need for haste, and the district court failed to recognize that possibility, we will direct that on remand the bankruptcy court reconsider its findings in this respect as well.

## VII.

### SUMMARY

In summary, we hold that the case before us is not moot because there remains the outstanding issue of the status of the claims of the plant guards. We hold that section 1113 does not require the bankruptcy court to examine the necessity of proposed modifications to the collective bargaining contract independently of its consideration of the proposal that has been made. We further hold that the bankruptcy court erred in its interpretation and application of the "necessary" standard, because it failed to give due regard to Congress' intent that "necessity" be strictly construed and failed to address the absence of a "snap back". Moreover, the district court erred in limiting its review of the bankruptcy court's finding in this regard under the clearly erroneous standard. We hold that the reasons given by the bankruptcy court in concluding that the proposal was "fair and equitable" cannot adequately support its conclusion because the court failed to give any persuasive rationale for the disproportionate treatment of the employees who were being asked to take a five-year agreement under a worst-case scenario without any possibility for restoration or share in the event of a better-than-anticipated recovery.

For the foregoing reasons, we will vacate the order of the district court and remand to that court with directions that it remand this case to the bankruptcy court for such further proceedings as may be appropriate under the circumstances. The Union, the principal bank creditors, and Wheeling-Pittsburgh are to share costs on appeal equally.