### In re LIBERTY CAB & LIMOUSINE CO., INC., Debtor.

**Bankruptcy No. 96–11293SR.**

United States Bankruptcy Court,
E.D. Pennsylvania.

April 11, 1996.

Frederic J. Baker, Asst. U.S. Trustee, Philadelphia, PA.

Robert M. Goldlich, Wolf, Block, Schorr and Solis–Cohen, Philadelphia, PA, Special Labor Counsel for Debtor.

Richard G. Placey, Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, for Debtor.

Norton H. Brainard, III, Philadelphia, PA, for Union.

### OPINION

STEPHEN RASLAVICH, Bankruptcy Judge.

#### Introduction.

Before the Court is a Motion by the above Debtor, Liberty Cab & Limousine Co., Inc., under 11 U.S.C. § 1113(d)(1) for permission to modify the terms of a collective bargaining agreement with certain drivers represented by Teamsters Union Local 115 (hereinafter the "Union"). The Debtor's request for relief was originally heard on an expedited basis and, after an evidentiary hearing held March 11, 1996, interim authority to make certain requested changes was granted by Order dated March 19, 1996. A further evidentiary hearing for the purpose of considering final relief was held March 25, 1996 and the issues in dispute have been briefed by both the Debtor and the Union. The question of permanent relief is thus ripe for disposition. For the reasons which follow, the Debtor's Motion will be denied.

#### Background.

As its name implies, the Debtor operates a cab and limousine service. Specifically, the Debtor utilizes a fleet of leased vehicles to operate both a non-union door to door sedan service known as "Car One" and a unionized airport van shuttle service known as "Super Shuttle." The Debtor employs approximately 34 non-union drivers, 90 union drivers, and 41 administrative and dispatch employees. The Debtor has experienced significant operating losses over the past few years. In this respect, Debtor's Exhibit M–2 reflects that the Debtor experienced a net loss in calendar year 1993 in the amount of $363,286, and that this loss grew to $593,968 in calendar year 1994, and then to $1,490,791 in calendar year 1995. According to the Debtor's Motion, these operating losses rendered the Debtor unable to meet ongoing contractual obligations to the Union and led it to seek modification of the terms and conditions of the Union contract prior to the filing of its bankruptcy case. The failure to reach an agreement with the Union on this score appears to have been the immediate cause for the initiation of this Chapter 11 case on February 16, 1996, although the Debtor also has scheduled substantial secured, priority and non priority debt.

The issue before the Court arose initially in the context of the Debtor's request for authority to use cash collateral pursuant to 11 U.S.C. § 363. On this score the Debtor acknowledges that entities known as Tri–Star Enterprises Inc., Metro–Care Inc., and/or Airport Shuttle Services of Wilmington, Inc., (collectively "Airport Shuttle") are secured creditors having an interest in its cash collateral. Consistent with the requirements of 11 U.S.C. § 363, therefore, and shortly after the commencement of its case, the Debtor sought Court approval of a consensual stipulation with Airport Shuttle for the use of cash collateral. The Union appeared in opposition to this request at an expedited hearing held on February 22, 1996. The Union objected to the Debtor's request on the basis that the Debtor's proposed budget for operations during the term covered by the stipulation provided for implementation of the very modifications to the Union drivers's contractual wages and benefits that had been rejected during prior negotiations between the parties. A disagreement between the parties over the Debtor's right to

unilaterally implement the proposed contract modifications, coupled with the Court's own uncertainty over that issue, led to a continuance of the cash collateral hearing until February 28, 1996, with instruction to the parties to return prepared to substantively address the issue in more complete fashion. At the continued hearing of February 28, 1996, all were agreed that under 11 U.S.C. § 1113(f) the Debtor had no authority to unilaterally reduce contractual wages and benefits, but was instead obliged to first seek interim relief under 11 U.S.C. § 1113(e). Consistent with this, the Debtor filed the instant motion on February 23, 1996 seeking interim and permanent relief under 11 U.S.C. § 1113.

An Answer in opposition to the Debtor's Motion was filed by the Union on March 5, 1996 and, as noted, an expedited evidentiary hearing with respect to interim relief was held March 11, 1996. At that hearing the Debtor offered the testimony of its president, Glen Littman. Mr. Littman testified that Liberty Cab has been in business for approximately 28 years. Prior to 1994, the company's airport shuttle service served only suburban Philadelphia, operating during that time from counters at the Philadelphia airport. Following 1994, the Debtor's shuttle service was expanded to also include the County of Philadelphia. In July of 1995, the shuttle service was further expanded when the Debtor merged its shuttle operation with Airport Shuttle Service of Wilmington Inc., changed its trade name to "Supershuttle," and began servicing the State of Delaware along with Philadelphia and its suburbs. As part of the 1995 restructuring, the Debtor for the first time also began offering customers door to door shuttle service to the airport. Concurrent with this, however, the Company was required by the City of Philadelphia to close its counters at the airport and had to relocate its dispatching and reservation operations to a remote site. The scope of the Company's operations today appears otherwise to remain essentially the same as it existed at the time of the July 1995 restructuring.

Terms and conditions of employment for the Debtor's Union drivers are set forth in a collective bargaining agreement dated July 6, 1995, (Exhibit M–1). Under the existing Union contract drivers receive, in addition to tips estimated at 11%, the higher of 1) $6.92 per hour or 2) a per capita share in a pool consisting of 31% of gross union driver revenues. In addition to the foregoing, drivers receive certain health benefits, holiday and sick time pay, and contributions on their behalf to the Union's legal and scholarship fund. As previously noted, the Debtor has experienced significant operating losses. The Debtor attributes these losses, in part, 1) to a failure to have realized economies of scale which were anticipated to follow its restructuring, 2) to the discontinuance of its counter operations at the airport, and 3) to the allegedly onerous and uncompetitive obligations imposed under its contract with the Union. In the latter respect, the Debtor proposes herein the following modifications to its Union contract obligations.

### PROPOSED MODIFICATION TO UNION CONTRACT

1. *Individual Commission on Weekly Gross Revenue:*

Commission Rate will be applied to the individual Gross Fares of each driver (Not Pooled) for all Revenue net of Airport Egress fees collected during the seven day period beginning Monday and ending Sunday of each week. Shifts are all 9 hours or fractions thereof.

2. *Minimum Hourly Wage will be guaranteed plus tips:*

Wages will be the higher of the Commission wages or $4.25 per hours; plus tips. Commission percentages will be based on length of employment as follows:

| 1–6 months | 25% |
| 7–24 months | 26% |
| 25–36 months | 27% |
| 37 + months | 28% |

3. *Floating Holidays/Vacations/Personal Days for all Full Time Drivers:*

Full Time Drivers working 250 days per year or 2,340 hours will be eligible for paid floating holiday as follows:

| | Floating Holiday Day | Personal/Sick Day |
|---|---|---|
| 1 year | 5 | 1 |
| 2–3 years | 5 | 3 |
| 4 + years | 10 | 3 |

4. ***HMO Health Insurance for the Employee:***

   All full time employees eligible for 50% of the cost of an HMO up to $50.00 per month for the employee. $116.10 single coverage Now. February 1996 Open Enrollment.

5. ***Uniforms, Hats, Jackets:***

   Driver will be issued at cost *the jackets and the hat,* the cost of these items will be refunded when the employee return them at the end of his/her employment. New items will be issued in exchange for old ones at no additional deposit.

6. Eliminate contribution to Legal and Scholarship Funds.

The Debtor projects that implementation of the foregoing adjustments will reduce its Union driver costs from 53% of gross revenues to 36% and produce a savings of $9,754.12 per week. (Exhibit M–5). Accepting the Debtor's assertion that its Supershuttle operation accounts for approximately 70% of its aggregate revenue, the proposed modifications, according to the Debtor, will enable it thereafter to produce a 2% net profit on an annual basis. (Exhibit M–6) This projection, it must be noted, is based as well on a fairly sharp projected increase in gross revenues from roughly $82,000 per week in 1995 (Exhibit M–2) to $118,700 per week in 1996. (Exhibit M–6)

The Debtor's argument that the terms of the present Union contract are onerous is predicated, in part, on the acknowledged fact that the Supershuttle service has for sometime failed to generate sufficient revenues such that wages that would otherwise be paid to Union drivers on a percentage basis exceed the guaranteed minimum wage of $6.92 per hour. The Debtor attributes this fact largely to its present, allegedly anachronistic pooled commission system which, it believes, operates as a disincentive for "good" drivers to maximize their individual shift receipts, since they would then in effect be subsidizing less motivated workers. In support of the foregoing propositions, the Debtor offered evidence which tended to confirm that the average driver revenue per shift from the airport shuttle service in Philadelphia lags substantially behind that of most other major cities, and that driver wages as a percentage of revenue are, in turn, substantially higher than in other cities. (Exhibit M–7) The Debtor contends that elimination of the shared commission arrangement will create driver incentives which, over time, will result in increased revenues and increased driver wages. The Debtor maintained that its experience with the non union Car One drivers bears this out. In further support of this, the Debtor offered data which reflected that, although the "guaranteed" wages of union drivers were reduced by approximately 35%, ($6.92 per hour to $4.25) as a result of the allowed interim modifications, average driver wages for the ensuing five weeks (with tip income included) in actuality declined only 13% over that which would have been received by the drivers under the existing contract, assuming the same level of tip income and the previous guaranteed minimum hourly wage rate. (Exhibit M–8)[1] The Debtor offered additional data to suggest that if average daily shift revenue can be increased from the present level of approximately $135 to approximately $225, the variance in wages earned under the old and new systems would be eliminated in its entirety. (Exhibit M–9).

The Union's specific responses to the Debtor's plethora of charts and data were not especially helpful. Notably, the Union has not contested the Debtor's historic income and expense figures, nor does it take issue with the dire financial predicament in which these now place the Debtor. The Union did observe, accurately, that the Debtor's proposed reductions focused only on the Company's *Union* employees and did not appear to include either the non-union drivers, or the Debtor's dispatch and administrative employees. The Union furthermore took issue with the assertion that the proposed modifications were the *minimum* modifications essential to continuation of the Debtor's business, or the minimum necessary to avoid irreparable damage to the Bankruptcy estate. Beyond this, the Union asserted in its answer to the Debtor's Motion, rather

---

**1.** The Union responds accurately, however, that the overall reduction is somewhat larger if the effect of reduced benefits is also taken into consideration.

paradoxically, that even if the relief sought by the Debtor were granted it would not enable the Debtor to present a viable plan of reorganization and that, indeed, the Debtor faces inevitable liquidation.

The principal thrust of the Union's response to the Debtor's Motion was centered more on an alleged failure by the Debtor to have furnished the Union with sufficient financial information to consider the Debtor's proposal at, or in advance, of the parties' single post-petition negotiating session. Coupled with this was a more broad based challenge to the Debtor's "good faith" participation in the negotiations. In this respect, the record reflects that on the petition filing date the Debtor's special labor counsel transmitted a letter to the Union (Exhibit U–1) enclosing therewith a proposal for contract modification pursuant to 11 U.S.C. § 1113(b)(1). The letter ended thusly:

> It is Liberty's intention to file as soon as possible an application for rejection of the current collective bargaining agreement as well as a motion for interim relief pursuant to 11 U.S.C. § 1113(e). Please let me know as soon as possible whether the Union believes it would be productive to hold a meeting to discuss our proposal, and if so of your availability next week for such a meeting.

A meeting between the parties apparently occurred on or about February 23, 1996, although the parties disagree somewhat on exactly what transpired. The Union agrees that it was presented at this meeting with summary financial data, but complains that the analytical data reflected in the numerous debtor exhibits offered at the March 11th and March 25th hearings was not furnished to it prior to those hearings. The Union also contends that at the meeting of February 23, 1996, it was simply presented with a "take it or leave it" proposition with no expressed willingness on the part of the debtor to "negotiate" any of the proposed contract modifications. The Union asserts that the Debtor's stance led it to conclude that further meetings would not be productive, and that none were therefore requested or held.

The Debtor, in turn, defends its negotiating tactics. Although other than possibly the Union's characterization of the Debtor's mental state, the facts and circumstances surrounding the parties' post petition negotiations appear to be generally as the Union maintains. The record is insufficient, however, for the Court to draw a firm conclusion as to the reasons for the parties rather quick impasse. The Union contends that the Debtor's unspoken strategy is in reality to accelerate the demise of the Supershuttle operation so as to focus thereafter solely on the profitable Car One component of its business. The Debtor, on the other hand, categorically denies any such strategy. To establish and contest what it contends is the Debtor's scheme, the Union has initiated both a lawsuit in the District court as well as a separate grievance procedure before the National Labor Relations Board. The disposition of the instant Motion, however, cannot await the resolution of those proceedings.

At the hearing on March 11, 1996, the Court agreed that the Debtor's cost savings measures appeared to be directed disproportionately at union drivers. The Court moreover expressed some skepticism that the proposed contract modifications could be expected to produce the significant increase in revenues apparently needed to restore the Debtor to profitability. In response to the latter point, the Debtor, and its supporting secured creditors, pointed to a permitted tariff increase which the Debtor had recently received from the Pennsylvania Public Utility Commission, the newly opened Pennsylvania Convention Center, and other efforts undertaken by the Debtor to improve its market share. All of these factors, it was hoped, would also help to boost revenue. With respect to the administrative and dispatch personnel issue the Debtor argued 1) that it had recently laid off 9 such employees, 2) that unlike union employees the administrative and dispatch employees had received no wage increases for several years, and 3) that the administrative and dispatch employees earn no tips. The Debtor also stressed that the proposed reduced individual commission arrangement had already been implemented for its non-union drivers, and that the proposed reduction in union driver health benefits had likewise already

been implemented for non union drivers and was about to be implemented for administrative and dispatch employees.

The Debtor's financial evidence, as noted, was largely unrebutted. The Union's attorney testified and confirmed that the Debtor was delinquent in its remittance of dues. The local shop steward also testified and opined that the Debtor's depressed revenues were traceable to poor pricing and dispatching policies as opposed to other things. The shop steward further expressed apprehension that abandonment of the shared commission system might lead to favoritism or promote uneven treatment among drivers in the assignment of fares.

At the conclusion of the interim hearing, the Court retained its reservations as to the Debtor's ability to increase its revenues by the amounts projected, however the Court had few doubts as to the propriety of the Debtor's request for interim relief. Most of the Debtor's expenses are fixed such that wages and benefits are the only area for substantial cost cutting. The only material reservation on this score was the Debtor's proposal to leave administrative and dispatch wages entirely unaffected. The March 19, 1996 Order granting interim relief therefore authorized the immediate institution of the individual commission system along with the proposed modifications to health and other fringe benefits (retroactive to the date the Debtors's motion was filed). The reduction in the guaranteed portion of union driver wages, however, was conditioned upon a pro rata reduction being implemented for administrative and dispatch employees.

As noted, a hearing to consider the Debtor's request for final relief was held March 25, 1996. At this hearing, the Debtor pressed its request to permanently effect the changes originally sought in its Motion. For present purposes, the record from the hearing on interim relief has been incorporated with the record made at the hearing of March 25, 1996.

*Discussion.*

■ Under 11 U.S.C. § 1113(c), Bankruptcy Court approval of a Debtor's request to permanently modify the terms of an existing collective bargaining agreement is subject to the Court's finding that:

1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);

2) the authorized representative of the employees has refused to accept such proposal without good cause; and

3) the balance of the equities clearly favors rejection of such agreement.

Subsection (b)(1) of Section 1113 referred to above in turn requires the following:

(b)(1) Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section "trustee" shall include a debtor in possession), shall—

(A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and

(B) provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.

The leading appellate decision in this jurisdiction which considers the above requirements is *Wheeling–Pittsburgh Steel Corporation v. United Steelworkers of America, AFL–CIO–CLC*, 791 F.2d 1074 (3d. Cir.1986) As former Chief Judge Twardowski observed in *In re William P. Brogna & Co., Inc.*, 64 B.R. 390 (Bankr.E.D.Pa.1986), the Circuit Court in *Wheeling–Pittsburgh* construed the requirements of 11 U.S.C. § 1113(b)(1) to be in the conjunctive; that is, to require that the Bankruptcy Court determine whether a Debtor's proposal both "provides for those necessary modifications in the employees' benefits and protections that are necessary to permit the reorganization of the debtor *and* ensures that all creditors, the debtor and

all affected parties are treated fairly and equitably." 791 F.2d at 1086. Moreover, the Circuit Court in *Wheeling–Pittsburgh*, specifically noted that the term "necessary" as used in Section 1113(b)(1)(A) was synonymous with the term "essential," thus permitting only those modifications to a contract which are limited to the short term goal of preventing a Debtor's liquidation, as opposed to broader modifications focused on the long term economic health of a debtor. In analyzing the case before it, the Circuit Court also noted with apparent approval the following nine step analytical process enunciated in *In re American Provision Co.*, 44 B.R. 907, 909 (Bankr.D.Minn.1984):

1. The debtor in possession must make a proposal to the Union to modify the collective bargaining agreement.

2. The proposal must be based on the most complete and reliable information available at the time of the proposal.

3. The proposed modifications must be necessary to permit the reorganization of the debtor.

4. The proposed modifications must be assure that all creditors, the debtor and all of the affected parties are treated fairly and equitably.

5. The debtor must provide to the Union such relevant information as is necessary to evaluate the proposal.

6. Between the time of the making of the proposal and the time of the hearing on the approval of the rejection of the existing collective bargaining agreement, the debtor must meet at reasonable times with the Union.

7. At the meetings the debtor must confer in good faith in attempting to reach mutually satisfactory modifications of the collective bargaining agreement.

8. The Union must have refused to accept the proposal without good cause.

9. The balance of the equities must clearly favor rejection of the collective bargaining agreement.

■ This Court notes that the Debtor bears the burden of proving each element required for rejection of a collective bargaining agreement by a preponderance of the evidence. *In re Garofalo's Finer Foods, Inc.*, 117 B.R. 363 (Bankr.N.D.Ill.1990). Once the Debtor has established a *prima facie* case, the burden of refutation shifts to the Union. The ultimate burden of persuasion, however, remains with the Debtor. *See*, Russell, *Bankruptcy Evidence Manual*, 1995–96 Ed., § 301.80 and cases cited therein.

Certain of the above steps are easily dispatched. Clearly, the Debtor has made the required proposal to the Union, and that proposal appears based on the most complete and reliable information available to the Debtor. Other things, however, are less certain. The financial information presented on March 11, 1996 and March 25, 1996, standing alone, does weigh in favor of the "necessity" of the proposed contract modifications, as that term has been construed in *Wheeling Pittsburgh*. On this point the evidence established, rather clearly, that the Debtor will sustain ongoing operating losses, and ostensibly face liquidation, if forced to pay wages at the existing contract rate. The explanation for the total exclusion of administrative and dispatch employees from the brunt of the proposed wage reduction however, was unpersuasive.[2] In approving the instant Motion, therefore, the Court would similarly condition permanent modification of the Union contract on commensurate reductions to the wages of administrative and dispatch employees such as were implemented via the interim Order of March 19, 1996. It is troubling, however, that perhaps the most meaningful financial and statistical information available was apparently not furnished to the

2. In this respect, the Court notes that the Debtor's compliance with the directive of the March 19, 1996 Order that it spread the proposed reduction in fixed wages on a pro rata basis among both Union and administrative/dispatch employees was achieved by consensually absorbing the entire reduction through a cut to its 3 member "executive" payroll, thereby leaving intact the

wages and benefits of all other administrative/dispatch employees. Any ultimate approval of permanent modification of the contract would also be conditioned on the Debtor effecting the proposed co-pay health benefit program for administrative and dispatch employees consistent with the testimony offered on March 25, 1996.

Union in advance of the parties post petition bargaining session. This failure, for whatever reason, must surely have undermined the negotiating process. The Debtor's letter of February 16, 1996, meanwhile, hardly appears designed to encourage a dialogue between the parties, and indeed seems to imply a "take it or leave it" attitude on the part of the Debtor. Similarly disturbing is the complete absence of any discussion between the parties concerning any potential future restoration of foregone wages and/or benefits. While some courts have declined to construe *Wheeling Pittsburgh* as mandating the inclusion of such so called "snap-back" provisions in the context of 11 U.S.C. § 1113, *See, e.g., In re Sierra Steel Corporation*, 88 B.R. 337 (Bankr.D.Colo.1988); *Wheeling Pittsburgh*, at a minimum, would appear to require some consideration of that issue.[3]

In light of the foregoing, it is difficult for the Court to draw reasoned and favorable conclusions with respect to steps 4, 8 and 9 of the above analytical framework. Bearing in mind both the Circuit Court's admonition in *Wheeling–Pittsburgh* against hasty action, 791 F.2d at 1093, as well as a recognized national policy favoring collective bargaining agreements, *id.*, the Court is disinclined at this juncture, and on this record, to approve the Debtor's proposed contract modifications as permanent. Rather, the Court would prefer and will direct that the parties at least attempt further negotiation. At such time the Union, having the benefit of the Debtor's statistical and analytical data, can better evaluate the Debtor's position, and will have an opportunity, if it chooses, to make the counter-offer which its testimony in Court seemed to suggest that it had been prevented from making. Similarly, consideration can be given by the parties to the propriety, if any, of the inclusion of a snap back clause. Pending such further negotiations, the Debtor's request for permanent relief under 11 U.S.C. § 1113 will be denied, without prejudice. In recognition of the Debtor's financial circumstances, however, the interim contract modifications previously approved shall continue in effect subject to further order of Court after the follow-up hearing which will be scheduled pursuant to the accompanying Order.

---

3. In its post-hearing brief, the Debtor refers to the existence of a "'snap back' provision assuring Union drivers that as Liberty's revenues increase, their wages will also increase, and the drivers' proportional contribution to Liberty cost savings will decrease." Apparently, the Debtor is referring to the fact that if revenues increase, the individual drivers' wages will be based on the proposed, albeit reduced, commission, rather than on the proposed reduced hourly wage rate currently in effect. The Court is not convinced, however, that the Debtor's proposal is in accord with the type of "snap back" provision contemplated in *Wheeling–Pittsburgh*, 791 F.2d at 1093. Under the proposed modification, the union drivers' wages and benefits are reduced even in the event that the Debtor performs more favorably than anticipated.