**In re JEFLEY, INC., Debtor.**

**Bankruptcy No. 97–18010DAS.**

United States Bankruptcy Court,
E.D. Pennsylvania.

March 3, 1998.

Joel C. Shapiro, Blank, Rome, Comisky & McCauley, Philadelphia, PA, General Counsel for Debtor.

Barry Bevacqua, Blank, Rome, Comisky & McCauley, Philadelphia, PA, Labor Counsel for Debtor.

Warren Borish, Spear, Wilderman & Borish, Philadelphia, PA, for Union.

Gary D. Bressler, Leon R. Barson, Adelman, Lavine, Gold & Levin, Philadelphia, PA, for Creditors' Committee.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA, U.S. Trustee.

*OPINION*

DAVID A. SCHOLL, Chief Judge.

*A. INTRODUCTION*

The instant Motion presents this court with its first opportunity to consider a debtor's attempt to reject a collective bargaining agreement pursuant to 11 U.S.C. § 1113. Because we believe that the Debtor's proposal for modification of the agreement on record, which will expire seventeen days from the date of this Opinion on March 20, 1998, did not specify any reduction in the principals' own salaries and may not reduce payments to creditors commensurate with the reductions to union members, we conclude that the proposal, as presented, is not "necessary" to the Debtor's reorganization; does not treat the union workers "fairly and equitably;" that the union therefore had good cause to refuse the proposal; and that the balance of the equities does not favor rejection. However, because we understand that the Debtor has continued to bargain with the union after the hearing and may have cured or be able to cure the proposal's shortcomings with relatively modest changes, and we wish to provide input from the Official Committee of Unsecured Creditors ("the Committee") in any negotiation process, we will enter an order which merely refuses to grant the Motion on the present record; directs the parties to make at least one last attempt under the bargaining process with the Committee's participation; and reschedule a further hearing on the motion on March 11, 1998, at which time we will allow the parties

to, *inter alia,* supplement the record with subsequent proposals, to be filed by March 9, 1998.

*B. PROCEDURAL AND FACTUAL HISTORY*

JEFLEY, INC. ("the Debtor") operates three retail supermarkets, in Trevose, Pennsylvania; Lawrenceville, New Jersey; and Ewing, New Jersey. It filed the underlying voluntary Chapter 11 bankruptcy case on July 2, 1997. The filing appears to have been prompted by large claims against the Debtor; its owner, Jeffrey Shprintz ("Jeffrey"); and its former owner, Jeffrey's father Earle ("Earle"), by the Internal Revenue Service ("the IRS"), seeking to recoup untaxed profits from a fraudulent scheme, allegedly masterminded by Earle, involving improper remittances of manufacturers' discount coupons.

Faced with losses attributed to intensified competition, as well as the burdens imposed by the IRS, the Debtor, during the course of the case took several corrective measures. These included closing its least profitable fourth store, obtaining permission to replace its principal vendor, eliminating consulting fees and stock purchase payments to Earle and Jeffrey's brother, and cutting its administrative staff from seven to four persons. It also negotiated a "pot" plan of reorganization ("the Plan") with the Committee which it filed on January 30, 1998. A hearing on the proposed disclosure statement accompanying the Plan is scheduled on March 11, 1998. Under the Plan the Debtor was to remit, for the benefit of unsecured creditors, $100,000 on the effective date and $175,000 annually for the next six years. These payments would result in a recovery between ten (10%) percent and thirty-eight (38%) percent for unsecured creditors, depending on the outcome of objections to certain of the claims.

The Motion was filed on January 27, 1998. Pursuant to 11 U.S.C. § 1113(d)(1), a hearing on the Motion was scheduled and commenced on February 10, 1998, and concluded on the following day. The following facts were adduced at that hearing.

The Debtor has, for many years, been a party to two collective bargaining agreements with the United Food and Commercial Workers Union. The first, with Local 56, which expired in November 1997, but under which the parties continue to operate, includes 25–28 butchers, wrappers, and sellers of meat and seafood. The other, with Local 1360, which expires on March 20, 1998, includes 110–119 retail clerks.

On December 11, 1997, the Debtor advised both Locals that, as a possible preliminary to a 11 U.S.C. § 1113 motion, it wished to discuss modifications to numerous terms of the agreements. The Debtor's proposal was based upon its conclusion that its labor costs would have to be reduced by an annual amount of about $720,000, approximately $125,000 and $595,000, respectively, by workers from Locals 56 and 1360, to comply with the terms of the Plan. This proposal contemplated a reduction in the combined salaries of Jeffrey and his wife Joni, who works on a regular but less than full-time basis as an administrator, from $670,000 to $350,000 annually.

The modifications proposed included reductions in vacation times, holidays, and personal days; a freeze on employees' pensions and health and welfare contributions; an increase from 16 hours to 20 hours in the minimum weekly work-time necessary to qualify for health and welfare benefits; reductions of premiums for working on Sundays; and the placement of a cap of $10.00 on cashiers' hourly rates. The last proposal, which caused the most controversy, would have constituted a large savings for the Debtor because, although the Debtor's starting rate of a pay, per its union contracts, was only $5.50/hour and the maximum rate after four years was fixed at $9.75/hour, the Debtor retained many employees who had worked for it for many years and received the benefit of across-the-board increases which raised their rates to $14 to $15/hour. *Compare In re Garofalo's Finer Foods, Inc.,* 117 B.R. 363, 366 (Bankr.N.D.Ill.1990). The proposal did include a "snapback," whereby one-third of the profits generated in excess of projections were to be disbursed to union members.

Local 56 agreed to the proposal, apparently because most of its members were more skilled workers who would be spared the one-third reductions proposed to many of the clerks. Local 1360 did not. A specific proposal of the Debtor was provided to Local 1360 at an initial collective bargaining session on January 12, 1998. Additional bargaining sessions were conducted on January 16, 1998, and January 20, 1998. On January 24, 1998, on the recommendation of Local 1360, the vast majority of that Local's membership voted against acceptance of the Debtor's proposed modifications. The parties met again on February 4, 1998, but did not met again prior to the hearing on February 10 and 11, 1998. Local 1360 offered one counter-proposal, on February 4, which contemplated acceptance of many terms involved in the Debtor's proposal, but not the most significant terms, *i.e.,* reductions in Sunday premiums and the proposed caps on hourly rates. The Debtor cashed out Local 1360's counter-proposal as effecting a savings of only $300,000, about half of what was needed.

No serious disputes with the Debtor's financial calculations and projections emerged. Local 1360 and this court questioned Jeffrey regarding the salaries of him and his wife. He testified that he needed $90,000 net annually to pay his personal share of restitution due as a result of the coupon fraud and $30,000 to send his two children, described as having an attention deficit disorder and reading problems, respectively, to remedial schools. He also indicated that he and Earle are co-owners of realty used by the Debtor for corporate offices. The rent has, however, been reduced to merely cover the mortgage. A sale of this building is contemplated, from which any profits are to be contributed to the Debtor's reorganization. Jeffrey and his family also receive the full use of a 1997 Landcruiser rented by the Debtor for $950 monthly and full health and welfare benefits.

The Committee, on its part, expressed an unwillingness to reduce its constituents' dividends as negotiated in the plan.

In the course of the hearing, we expressed some surprise concerning the timing of the filing of the Motion, pointing out that several months had elapsed in the case without any

request to labor for changes in the collective bargaining agreements, and noted that the agreement with Local 1360 would expire in any event in about a month. The Debtor's counsel contended that the delay in filing the Motion resulted from exhaustive efforts to pursue alternatives which would have avoided rejecting the labor contracts. He also argued that the Debtor would be obliged to abide by the terms of the 1360 collective agreement even after its expiration unless the parties reached an "impasse" in their negotiations for its renewal or extension. *See NLRB v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); and *American Federation of Television & Radio Artists v. NLRB*, 395 F.2d 622 (D.C.Cir.1968).

The parties were granted a request to simultaneously file post-hearing submissions by February 20, 1998. The Debtor and the Committee filed briefs supporting the Motion. Local 1360 opposed the Motion, joined by letters submitted by a few individual employees *pro se*, the latter of whom appeared to mostly resent the Debtor's proposals for large pay decreases shortly after they had written letters supporting Jeffrey, at his request, in his efforts to reduce his sentence for his role in the coupon-scam fraud.

On February 23, 1998, the Debtor telephonically requested that we delay rendering a decision pending further negotiations between the Debtor and Local 1360. On February 27, 1998, we received a joint letter from counsel for the parties indicating that they had reached an agreement for a new four-year contract and put same to the Local's constituency for a vote on February 26, 1998. However, despite Local 1360's recommendation of acceptance, the Local 1360 employees rejected this agreement.

The letter included in its text a "summary" containing the "highlights" of the agreement which the letter stated should be considered by us as a pleading. Further, the letter stated that no further hearings were believed to be warranted, and that a prompt decision was requested. The Debtor also submitted, on February 27, 1998, a supplemental letter brief attaching a copy of a decision in *Mile Hi Systems, Inc.*, Case Nos. 27–CA–9241,–9418A, –9472, 1989 WL 224198 (NLRB, July 30, 1986), which purportedly holds that, after a court permits rejection under § 1113, the Debtor is permitted to change only those terms and conditions of the collective bargaining agreement recited in its § 1113 proposal.

The summary of the proposal reflected a $2.50/hour reduction across-the-board except that no reduced rate would fall below $9.00/hour. Other issues, including premium pay, vacations, holidays, personal days, health and welfare, pensions, and manning were discussed. Jeffrey and his wife "were and remain prepared to accept unspecified reductions in their salaries." No changes in the Plan were mentioned. Local 1360 requested an opportunity to respond to the Debtor's supplemental submission by March 2, 1998, but advised us, on that date, that no such submission would be forthcoming.

### C. DISCUSSION

At the close of the hearing, we indicated to the parties that we felt that the evidence supported the conclusion that all interests must give a little more. Accepting the $595,000 figure as an accurate statement of the annual dollar reduction in expenses required by the Debtor to survive in Chapter 11, a counter-proposal of Local 1360 which would save only $300,000 was clearly inadequate. It seemed to us that Local 1360's members would have to agree to some further reductions or possibly have their jobs lost in a fatal game of "chicken." However, it also seemed to us that further reductions in the salaries of Jeffrey and his wife and possibly the amount payable to unsecured creditors under the plan were in order as well. These findings would have resulted in our refusal to grant the Motion as it stood, since further compromise on the part of the Debtor's management and creditors appeared necessary.

We hoped that our comments, which we continue to believe reflected a balanced and reasonable application of the record to the applicable law, would spur further negotiations between the Debtor and Local 1360 along the lines indicated. Apparently it did cause negotiations to take place, but these

negotiations have, according to the parties, failed.

Although the parties have mutually requested that we consider their joint letter outlining the rejected proposed agreement as a final further supplement to this record and rule on that record, we cannot do so, for several reasons. The most important is that the proposal as it exists is too vague and leaves too many unanswered questions. The foremost among these questions is why the employees rejected the proposal. Another is the perceived role of Local 1360 now that the proposal is rejected. A third is: what did the proposal cash out to in the way of monetary savings to the Debtor? A fourth question is precisely what further salary reductions to his family Jeffrey is proposing. Finally, it was our hope that further negotiations regarding the terms of the Plan could include the Committee as a party. Perhaps review of these questions could still permit a highly preferable agreement to be reached, or at least clarify that an "impasse" exists which might be relevant to the parties' status subsequent to March 20, 1998.

Neither the parties' briefs nor the unsuccessful supplemental negotiations shake our preliminary conclusions expressed at the close of the hearing. The substantive portions of the applicable Code provision, 11 U.S.C. §§ 1113(b), (c), read as follows:

(b)(1) Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section, "trustee" shall include a debtor in possession), shall—

(A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and

(B) provide, subject to subsection (d)(3), the representative of the employ-

ees with such relevant information as is necessary to evaluate the proposal.

(2) During the period beginning on the day of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1) [requiring the hearing to be held 14 days after the filing of the "application"], the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.

(c) the court shall approve an application for rejection of a collective bargaining agreement only if the court finds that—

(1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);

(2) the authorized representative of the employees has refused to accept such proposal without good cause; and

(3) the balance of the equities clearly favors rejection of such agreement.

The parties agree that, in *Wheeling–Pittsburgh Steel Corp. v. United Steelworkers of America, AFL–CIO–CLC,* 791 F.2d 1074, 1080–81 (3d Cir.1986), the court adopted the nine-step process for analysis of § 1113 applications set forth as follows in *In re American Provision Co.,* 44 B.R. 907, 909 (Bankr.D.Minn.1984):

1. The debtor in possession must make a proposal to the Union to modify the collective bargaining agreement.

2. The proposal must be based on the most complete and reliable information available at the time of the proposal.

3. The proposed modifications must be necessary to permit the reorganization of the debtor.

4. The proposed modifications must assure that all creditors, the debtor and all of the affected parties are treated fairly and equitably.

5. The debtor must provide to the Union such relevant information as is necessary to valuate the proposal.

6. Between the time of the making of the proposal and the time of the hearing

on approval of the rejection of the existing collective bargaining agreement, the debtor must meet at reasonable times with the Union.

7. At the meetings the debtor must confer in good faith in attempting to reach mutually satisfactory modifications of the collective bargaining agreement.

8. The Union must have refused to accept the proposal without good cause.

9. The balance of the equities must clearly favor rejection of the collective bargaining agreement (footnote omitted).

It is established in this Circuit that the burden of proving all nine elements falls upon the Debtor. *See In re Bowen Enterprises, Inc.,* 196 B.R. 734, 741 (Bankr.W.D.Pa.1996); and *In re Liberty Cab & Limousine Co.,* 194 B.R. 770, 776 (Bankr.E.D.Pa.1996). *Accord, Garofalo's, supra,* 117 B.R. at 370.

The procedures of § 1113 appears to have been followed both in letter and spirit by the Debtor and Local 1360. Despite some mild, typical "labor jargon" cross-accusations, both impressed us as proceeding in good faith and with appreciation for the concerns of the other. Therefore, the only pressure points of the nine-step process are those of substance, the third and fourth, which contemplate the perspective of the Debtor; and, as to the mirror image of the third and fourth steps from the perspective of the Union, the eighth and ninth steps. The issue, as we see it, can be boiled down to our deciding whether the Debtor, considering all of the circumstances, has proposed to reduce the union contract benefits only to the extent necessary to achieve equitable treatment of all parties interested in the case.

It appears to us that, in *Wheeling–Pittsburgh,* 791 F.2d at 1086–93, the court interpreted the element of necessity quite strictly ("'necessity' [must] be construed strictly to signify only modifications that the trustee is constrained to accept because they are directly related to the Company's financial condition and its reorganization." *Id.* at 1088.). It is true that the proposals of the Debtor contains a "snapback" provision, providing that one-third of any excess of profits over projections will be distributed to union employees. The absence of any such provision was the particular shortfall of the proposal considered in *Wheeling–Pittsburgh. Id.* at 1090–91. *See Liberty Cab,* 194 B.R. at 777 (court expressed concern about the absence of "snapback" in denying an application under § 1113 without prejudice); and *In re William P. Brogna & Co.,* 64 B.R. 390, 392 (Bankr.E.D.Pa.1986) (absence of a "snapback" is referenced as a strong consideration in denial of a § 1113 application). *But see Bowen Enterprises, supra,* 196 B.R. at 742 (a § 1113 application is granted despite the absence of any "snapback" provision in the debtor's proposal).

However, we were convinced that the Debtor and possibly the Committee should be required to give at least a little more in the negotiation process, as well as observing the necessity for movement on the part of Local 1360. The Debtor argued at and after the hearing that Jeffrey and Joni Shprintz cannot reduce their compensation below $350,000 annually, because $120,000 of their net pay of about $225,000 must be devoted to Jeffrey's restitution payments and their children's special education needs. This analysis, which generously assumes that the Debtor should bear the cost of Jeffrey's personal restitution and of his indulgence in very expensive remedial education for children with something less than overwhelming disabilities, still leaves this couple with over $100,000 net annual income, plus the fringe benefit of use of a company vehicle and fully-paid health and welfare benefits. It cannot be forgotten that, until after the bankruptcy filing, much greater compensation, larger rents, and payments to Earle and Jeffrey's brother were made and that these expenses have only recently been acknowledged as excesses. By way of contrast, the *Bowen Enterprises* officers, in a similar line of business, reduced their gross annual salaries to $50,000 and $27,500, respectively. 196 B.R. at 738. For purposes of analysis of the union employees' salaries, the Debtor argues that these employees could not do better at rival supermarkets. Subjecting Jeffrey to the same analysis, we doubt whether there is a substantial market for supermarket executives convicted of coupon fraud.

■ The Committee contends that the percentage return on its dividends under the plan is much less than the percentage of their wages that the union employees are asked to forfeit. However, it seems quite clear that, if the Debtor fails to reach an agreement with Local 1360, a strike or other job actions could ensue which would be fatal to the Debtor's operations and a hope of any recovery by unsecured creditors. The faceless Committee constituency has as much or more to lose by failing to compromise than the Debtor's workers, who have made the importance of their presence felt with very human appeals. Although the Committee obviously negotiated its return under the Plan with the Debtor, those negotiations were apparently at a near completion before the Debtor turned to the unions as a means of reducing costs to satisfy the negotiated resolution with the Committee. We will direct that the Committee's counsel participate in one further attempt at bargaining so that its constituents' interests can be directly negotiated with the Debtor and Local 1360. We note that, by this directive, we are not suggesting that the Committee become embroiled in labor issues, but merely that its presence shall be added at some point in the process. The status quo of complete absence of labor-Committee interplay deserves a change and may provide unexpected benefits.

We cannot find, as the court did in *Bowen Enterprises,* 196 B.R. at 743–44, that the changes proposed by the Debtor, at least as presented at the hearing, are/were fair and equitable when the circumstances of union workers are compared to those of non-unionized management employees: Like the *Brogna* court, 64 B.R. at 392–93, we find the potential for more sacrifice on the part of management. *See also Garofalo's, supra* (union offered no evidence at hearing and thus failed to present any issue regarding the relative sacrifices of management or creditors of the debtor).

We are disappointed that the agreement between the debtor and Local 1360, which would have apparently proposed a semi-permanent resolution to the parties' differences, was not approved by the Debtor's employees. Both parties may be disappointed that this court is unable to rule on this Motion on the basis of the present record. However, as we note above, the questions remaining are too significant, in our view, to permit a ruling without the best answers possible to those questions and perhaps others from both parties being placed on the record. We also must confess that we fail to see how the *Mile Hi Systems* decision is of any help to us in rendering our decision at this point. Perhaps this point could also be clarified at a supplemental hearing.

Thus, on the present record, like the court in *Liberty Cab,* we find ourselves reluctant to take "hasty action," 194 B.R. at 777, especially with the imminent expiration of the present collective bargaining agreement between the Debtor and Local 1360. As in *Liberty Cab, id.,* we hope that directing the parties to engage in at least one additional collective bargaining negotiation session, with the added participation of the Committee, may well be productive.

We will therefore enter no order granting or denying the Motion at this time, although same could be considered as an implied denial of same. We will, however, reschedule the Motion for receiving further evidence and thereafter rendering a different decision on the date of the presently-scheduled hearing on the Debtor's proposed disclosure statement, March 11, 1998. We shall request both the Debtor and Local 1360 to offer complete written proposals to us and the other interested parties on or before March 9, 1998, if no agreement is reached. If we determine that either party has refused to act reasonably or in good faith, and/or the evidence pertaining to post-hearing developments brings to light any additional facts which we deem determinative, we may grant or deny the Motion outright at that time.

## D. CONCLUSION

An order effecting the disposition described in this Opinion will be entered.